13-4179-cv
*Barrows v. Burwell*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2014
No. 13-4179-cv

LEE BARROWS, ET AL.,
individually and on behalf of all others similarly situated,
*Plaintiffs-Appellants*,

*v.*

SYLVIA MATHEWS BURWELL,
Secretary of Health and Human Services,
*Defendant-Appellee*.

Appeal from the United States District Court
for the District of Connecticut.

No. 3:11-cv-1703—Michael P. Shea, *Judge*.

ARGUED: OCTOBER 23, 2014
DECIDED: JANUARY 22, 2015

Before: WINTER, WALKER, and CABRANES, *Circuit Judges*.

In this putative class action lawsuit, plaintiffs-appellants sue the Secretary of Health and Human Services ("Secretary") on behalf of Medicare beneficiaries who were placed into "observation status" by their hospitals rather than being admitted as "inpatients." Because "inpatients" are covered by Medicare Part A, while patients in "observation status" are covered by Medicare Part B, placement into "observation status" allegedly caused these beneficiaries to pay thousands of dollars more for their medical care than they would have had they formally been admitted as "inpatients" to their hospitals.

The United States District Court for the District of Connecticut (Michael P. Shea, *Judge*) granted the Secretary's motion to dismiss the complaint in its entirety. Plaintiffs now appeal the dismissal of two of their nine claims, which together assert that the Secretary violated the Medicare Act and the federal Due Process Clause by failing to provide expedited notice of the decisions to place them into "observation status," or an expedited opportunity to challenge these decisions.

For the reasons that follow, the District Court's judgment is affirmed in part and vacated in part. Specifically, we affirm the dismissal of plaintiffs' Medicare Act claims for substantially the reasons stated in the District Court's opinion; we vacate, however, the dismissal of plaintiffs' Due Process claims. The District Court erred in concluding that plaintiffs lacked a property interest in being treated as "inpatients," because, in so concluding, the District Court accepted as true the Secretary's assertion that a hospital's decision to

2

formally admit a patient is "a complex medical judgment" left to the doctor's discretion. That conclusion, however, constituted an impermissible finding of fact, which in any event is inconsistent with the complaint's allegations that the decision to admit is, in practice, guided by fixed and objective criteria set forth in "commercial screening guides" issued by the Centers for Medicare & Medicaid Services ("CMS"). Treating the complaint's allegations as true, as we must at this stage, plaintiffs-appellants have arguably asserted a property interest protected by the federal Due Process Clause.

Accordingly, the District Court's judgment is **AFFIRMED** in part, insofar as it dismissed plaintiffs' Medicare Act claims, and **VACATED** in part, insofar as it dismissed plaintiffs' Due Process Clause claims. The cause is **REMANDED** to the District Court, with instructions to permit a period of limited discovery, focused on whether plaintiffs in fact possessed a property interest in being admitted to their hospitals as "inpatients." In the interest of judicial economy, any future appeals taken from the District Court's decisions shall be referred to this panel.

——————

ALICE BERS (Gill Deford, Center for Medicare Advocacy, Inc., Willimantic, CT; Anna Rich, National Senior Citizens Law Center, Oakland, CA, *on the brief*), Center for Medicare Advocacy, Inc., Willimantic, CT, *for Barrows, et al., Plaintiffs-Appellants*.

JEFFREY A. CLAIR (Stuart F. Delery, Assistant Attorney General, Adam C. Jed, Michael S. Raab, United States Department of Justice, Civil Division, Appellate Staff, Washington, DC; Deirdre M. Daly, United States Attorney for the District of Connecticut, *on the brief*), United States Department of Justice, Civil Division, Appellate Staff, Washington, DC, *for Burwell, Defendant-Appellee*.

Mark G. Arnold, Husch Blackwell LLP, Clayton, MO, *for Amicus Curiae American Health Care Association*.

Edith M. Kalls, Whatley Kallas, LLP, New York, NY, *for Amici Curiae American Medical Association, et al.*

Catherine E. Stetson, Hogan Lovells US LLP, Washington, DC, *for Amicus Curiae American Hospital Association*.

---

JOSÉ A. CABRANES, *Circuit Judge*:

In this putative class action lawsuit, plaintiffs-appellants sue the Secretary of Health and Human Services ("Secretary") on behalf of Medicare beneficiaries who were placed into "observation status" by their hospitals rather than being admitted as "inpatients."

4

Because "inpatients" are covered by Medicare Part A, while patients in "observation status" are covered by Medicare Part B, placement into "observation status" allegedly caused these beneficiaries to pay thousands of dollars more for their medical care than they would have had they formally been admitted as "inpatients" to their hospitals.

The United States District Court for the District of Connecticut (Michael P. Shea, *Judge*) granted the Secretary's motion to dismiss the complaint in its entirety. Plaintiffs now appeal the dismissal of two of their nine claims, which together assert that the Secretary violated the Medicare Act and the federal Due Process Clause by failing to provide expedited notice of the decisions to place them into "observation status," or an expedited opportunity to challenge these decisions.

For the reasons that follow, the District Court's judgment is affirmed in part and vacated in part. Specifically, we affirm the dismissal of plaintiffs' Medicare Act claims for substantially the reasons stated in the District Court's opinion; we vacate, however, the dismissal of plaintiffs' Due Process claims. The District Court erred in concluding that plaintiffs lacked a property interest in being treated as "inpatients," because, in so concluding, the District Court accepted as true the Secretary's assertion that a hospital's decision to formally admit a patient is "a complex medical judgment" left to the doctor's discretion. That conclusion, however, constituted an impermissible finding of fact, which in any event is inconsistent with the complaint's allegations that the decision to admit is, in

5

practice, guided by fixed and objective criteria set forth in "commercial screening guides" issued by the Centers for Medicare & Medicaid Services ("CMS"). Treating the complaint's allegations as true, as we must at this stage, plaintiffs-appellants have arguably asserted a property interest protected by the federal Due Process Clause.

## I. BACKGROUND

### A. Statutory Framework

Medicare is "the federal government's health-insurance program for the elderly."[1] It contains four distinct programs, of which two are relevant here.

The first, Medicare Part A, is titled "Hospital Insurance Benefits for Aged and Disabled."[2] It "provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care for, among others, eligible people over 65 years of age."[3] Most relevant to this case, Part A creates an entitlement to coverage for "inpatient hospital services" and "post-hospital extended care services."[4] The term "inpatient" is undefined

---

[1] *Conn. Dep't of Soc. Servs. v. Leavitt*, 428 F.3d 138, 141 (2d Cir. 2005) (citing Medicare Act (Title XVIII of the Social Security Act), 42 U.S.C. § 1395 *et seq.*).

[2] 42 U.S.C. §§ 1395c–1395i-5.

[3] *Estate of Landers v. Leavitt*, 545 F.3d 98, 103 (2d Cir. 2008) (internal quotation marks omitted).

6

in the statute, but the Secretary, through CMS—an office within the Department of Health and Human Services that administers Medicare—has defined an inpatient as "a person who has been admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services."[5] In *Estate of Landers*, we treated the CMS definition as "persuasive" under *Skidmore v. Swift & Co.*,[6] and held that "a Medicare beneficiary is not an inpatient within the meaning

---

[4] 42 U.S.C § 1395d(a).

[5] Medicare Benefit Policy Manual, CMS Pub. No. 100-02, ("Medicare Policy Manual") Ch. 1, § 10; *see also id.* ("Generally, a patient is considered an inpatient if formally admitted as inpatient with the expectation that he or she will remain at least overnight and occupy a bed even though it later develops that the patient can be discharged or transferred to another hospital and not actually use a hospital bed overnight.").

[6] In *Estate of Landers*, we explained that under so-called "*Skidmore* deference," we give effect to an agency's non-legislative interpretation of a statute "to the extent we find it persuasive." 545 F.3d at 105 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)); *see also id.* at 107 ("An agency interpretation that does not qualify for *Chevron* deference is still entitled to 'respect according to its persuasiveness,' . . . as evidenced by 'the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade[.]'" (quoting *United States v. Mead Corp.*, 533 U.S. 218, 221 (2001))). By contrast, "*Chevron* deference" is given to an administrative implementation of a statute "'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Rotimi v. Gonzales*, 473 F.3d 55, 57 (2d Cir. 2007) (quoting *Mead*, 533 U.S. at 226–27); *see Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984).

of § 1395x(i) unless he or she has been *formally admitted* to a hospital."[7]

The second program, Medicare Part B, is titled "Supplementary Medical Insurance Benefits for Aged and Disabled."[8] It is "a voluntary program offering supplemental insurance coverage for those persons already enrolled in the Medicare 'Part A' program."[9] Part B "covers visits to doctors and certain other *outpatient* treatment."[10] Because patients who are placed into "observation status" are treated as "outpatients" by CMS, their care is covered by Medicare Part B.[11] Therefore, a Medicare beneficiary's coverage under Part A or Part B turns on

---

[7] 545 F.3d at 111 (emphasis supplied).

[8] 42 U.S.C. §§ 1395j–1395w-5.

[9] *Furlong v. Shalala*, 238 F.3d 227, 229 (2d Cir. 2001).

[10] *Matthews v. Leavitt*, 452 F.3d 145, 146 n.1 (2d Cir. 2006) (emphasis supplied).

[11] 42 U.S.C. § 1395k; *see also* Medicare Policy Manual, Ch. 6, § 20.6(B) ("When a physician orders that a patient receive observation care, the patient's status is that of an outpatient."); *id.* § 20.6(A) (defining "Outpatient Observation Services" as a "set of specific, clinically appropriate services, which include ongoing short term treatment, assessment, and reassessment before a decision can be made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital"); *id.* § 20.2 ("A hospital outpatient is a person who has not been admitted by the hospital as an inpatient but is registered on the hospital records as an outpatient and receives services (rather than supplies alone) from the hospital . . . .").

whether hospital services were provided on an "inpatient" or "outpatient" basis. And as noted above, this distinction turns entirely on whether the patient was "formally admitted" to the hospital. It is possible for a patient to spend several days and nights in a hospital without ever being formally admitted; such a patient, for Medicare purposes, would be treated as an "outpatient" and his or her care would be covered by Part B.

The amount that a Medicare beneficiary pays out of pocket varies significantly based on whether the services provided were covered under Part A or Part B. For instance, if a beneficiary receives hospital services as an inpatient under Part A, there is a one-time deductible for the first 60 days in the hospital.[12] By contrast, if a beneficiary receives hospital services as an outpatient under Part B, he or she will owe a co-payment for each service received.[13] Moreover, Medicare will only cover the cost of post-hospitalization care at a skilled nursing facility ("SNF") if such treatment is provided "after transfer from a hospital in which [the individual] was an *inpatient* for not less than 3 consecutive days before his discharge."[14] Therefore, patients who are placed into "observation status" and never formally admitted to the hospital will not qualify

---

[12] 42 U.S.C. § 1395e.

[13] *See id.* § 1395cc(a)(2)(A).

[14] *Id.* § 1395x(i) (emphasis supplied).

9

for Medicare-covered SNF care, even if they are hospitalized for three or more consecutive days.[15]

## B. Facts and Procedural History

On November 3, 2011, plaintiffs filed this putative class action complaint, which asserts, *inter alia*, that the Secretary's use of "observation status" deprived them of the Part A coverage to which they were entitled. Each named plaintiff alleges that they were charged hundreds of dollars in co-payments under Medicare Part B, as well as thousands of dollars more for their post-hospitalization SNF care, despite the fact that they received hospital services substantially similar to those provided to "inpatients" for three or more consecutive days. For example, plaintiff Sarah Mulcahy alleges that, in June 2010 (when she was 96 years old), she was taken to the emergency room after suffering severe pain, urinary incontinence, and nausea resulting from a fall.[16] She was hospitalized in "observation status" for five days, during which time she received intravenous medications, chest and rib X-rays, and a CT scan of her head. She later received a Medicare Summary Notice ("MSN")

---

[15] *See also Estate of Landers*, 545 F.3d at 112 ("[I]n determining whether a Medicare beneficiary has met the statutory three-day hospital stay requirement needed to qualify for post-hospitalization SNF benefits under Part A, the time that the patient spends in the emergency room *or on observation status* before being formally admitted to the hospital does not count.") (emphasis supplied).

[16] *See* Joint App'x 38–39 (Compl. ¶¶ 78–82).

stating that she owed approximately $335 in Part B co-insurance payments.[17] Moreover, because the hospital never formally admitted her, she bore the entire cost of her subsequent SNF care from June 29 to October 7, 2010—a total of approximately $30,000.

Plaintiffs also allege that the Secretary is, at a minimum, indirectly responsible for these harms. First, plaintiffs assert that the frequency with which Medicare beneficiaries are placed on observation status, as well as the average time spent on observation status, have both increased "dramatically" in recent years.[18] Plaintiffs attribute these increases, in part, to the financial incentives created by a Medicare billing rule—namely that, "[i]f a beneficiary is admitted but that admission is later found to be improper, the

---

[17] As the District Court noted,

> [p]laintiffs received notice of Part B coverage and coinsurance charges via [MSNs], which they typically received several weeks or months after being discharged from the hospital. It is a fair inference from the Complaint that many of the Plaintiffs were not aware, during their period of hospitalization, that they were on observation status rather than admitted inpatients. For most, if not all, of the Plaintiffs, the MSN was the first indication that the services would be covered under Part B, not Part A.

*Bagnall v. Sebelius*, No. 11 Civ. 1703, 2013 WL 5346659, at *4 n.2 (D. Conn. Sept. 23, 2013).

[18] *See* Joint App'x 20 (Compl. ¶ 5).

11

hospital must refund the Part A payment to Medicare but cannot rebill under Part B."[19] This rule allegedly gives hospitals "an incentive to place patients on observation status because that placement at least ensures that the hospital will receive some payment for the stay in the hospital."[20] Moreover, according to plaintiffs, hospitals have become increasingly concerned with post-payment reviews, because "Recovery Audit Contractors have been carefully reviewing admissions, especially short-term admissions."[21]

Based on these and other factual allegations, the complaint pleads nine causes of action against the Secretary, including violations of the Medicare Act,[22] the Administrative Procedure Act,[23] the Freedom of Information Act,[24] and the Due Process Clause.[25] The

---

[19] Joint App'x 30 (Compl. ¶ 46). After this complaint was filed, the Secretary promulgated a rule designed to curb this financial incentive. *See* 42 C.F.R. § 414.5. Under the new rule, if a hospital determines that the beneficiary's inpatient admission was not reasonable and necessary, and that the beneficiary should have been treated as an outpatient, hospitals may nonetheless seek reimbursement under Part B, provided that the beneficiary is enrolled in Medicare Part B and the hospital timely submits a Part B claim.

[20] *Id.*

[21] *Id.*

[22] *See* Joint App'x 44–46 (Compl. ¶¶ 99, 101, 104–07) (citing 42 U.S.C. §§ 1395, 1395d(a), 1395hh(a)(2), 1395ff & 1395w-22(g)).

[23] *See* Joint App'x 44–45 (Compl. ¶¶ 100, 103) (citing 5 U.S.C. §§ 553 & 706(2)(A)).

[24] *See* Joint App'x 45 (Compl. ¶ 102) (citing 5 U.S.C. § 552(a)(1)(D)).

principal relief sought is a permanent injunction that would: (1) prohibit the Secretary "from allowing Medicare beneficiaries to be placed on observation status and thus to deprive them of Medicare Part A coverage to which they are entitled"; (2) direct the Secretary "to provide written notification, or to ensure that written notification is provided, to any Medicare beneficiary who is placed on observation status of the nature of the action, of the consequences for Medicare coverage, and of the right to administrative and judicial review of that action"; and (3) direct the Secretary "to establish a procedure for administrative review of a decision to place a Medicare beneficiary on observation status, including the right to expedited review."[26]

On January 9, 2012, the Secretary moved to dismiss the complaint in its entirety, and on September 23, 2013, the District Court granted the motion. On October 10, 2013, the District Court entered final judgment for the Secretary.

Plaintiffs timely appealed the District Court's dismissal of claims six and seven of the complaint.[27] Claim six asserts that the Secretary's "failure to provide written notification to Medicare

---

[25] *See* Joint App'x 46 (Compl. ¶¶ 104–05) (citing the "Due Process Clause of the Fifth Amendment," which states "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law").

[26] Joint App'x 47.

[27] Plaintiffs did not appeal the dismissal of their other seven claims.

beneficiaries, or to require that they receive written notification, of their placement on observation status, of the consequences of that placement for their Medicare coverage, and of their right to challenge that placement[,] violates the Medicare statute, 42 U.S.C. §§ 1395ff and 1395w-22(g), and the Due Process Clause of the Fifth Amendment."[28] Claim seven asserts that the Secretary's "policy of not providing Medicare beneficiaries with the right to administrative review, including expedited review, of their placement on observation status violates the Medicare statute, 42 U.S.C. §§ 1395ff and 1395w-22(g), and the Due Process Clause of the Fifth Amendment."[29]

Therefore, considered together, the two claims appealed by plaintiffs allege that the Secretary's failure to provide an expedited system of notice and administrative review regarding the placement of Medicare beneficiaries into "observation status" violated: (1) the Medicare Act and (2) the Due Process Clause. The sole question on appeal is whether the District Court erred in dismissing these two claims.

## II. DISCUSSION

We review *de novo* a district court's dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), accepting as

---

[28] Joint App'x 46 (Compl. ¶ 104).

[29] *Id.* (Compl. ¶ 105).

14

true all factual allegations in the complaint, and drawing all reasonable inferences in the plaintiff's favor.[30] To survive a Rule 12(b)(6) motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face."[31]

## A. Medicare Act Claims

As to the District Court's dismissal of plaintiffs' Medicare Act claims, we affirm substantially for the reasons articulated in the District Court's thorough opinion. First, plaintiffs lack standing to challenge the adequacy of the notices they received. Second, nothing in the statute entitles plaintiffs to the process changes they seek—*i.e.*, expedited notice of their placement into observation status, and an expedited hearing to challenge this placement.

As the District Court explained, the Medicare Act only requires that beneficiaries receive written notice of the receipt of a claim for benefits, which must state whether the beneficiary is entitled to Medicare coverage, and whether such coverage will be provided under Part A or Part B.[32] This written notice is called a

---

[30] *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014).

[31] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[32] *See* 42 U.S.C. § 1395ff(a)(1) (stating in relevant part that "[t]he Secretary shall . . . make initial determinations with respect to benefits under part A of this subchapter or part B of this subchapter in accordance with those regulations for the following: (A) [t]he initial determination of whether an individual is entitled to benefits under such parts[;] (B) [t]he initial determination of the amount of

15

Medicare Summary Notice ("MSN"), and it summarizes the patient's Medicare activity for the most recent three-month period. If an MSN states that benefits have been denied, then it must state: (1) the reasons for the denial; (2) the procedures for obtaining additional information concerning the denial; and (3) notification of the right to seek a redetermination or to otherwise appeal the determination.[33] The MSN also informs beneficiaries of their right to challenge the determination that they received observation services covered under Part B. It is undisputed that the Secretary has complied with these and other requirements.

Plaintiffs' sole argument on the merits is that 42 U.S.C. § 1395ff(b)(1)(F) entitles a beneficiary who is placed on "observation status" to expedited notice or administrative review. This provision, however, only applies when a hospital seeks "to terminate services" or "to discharge the individual from the provider of services."[34] It is clear from both the statute and our precedent that a beneficiary who is in "observation status" has not yet been formally admitted to the hospital. He or she has therefore not experienced a *termination* of services or a *discharge*.[35] Accordingly, § 1395ff(b)(1)(F) does not

---

benefits available to the individual under such parts[; and] (C) [a]ny other initial determination with respect to a claim for benefits under such parts . . . .").

[33] *See id.* § 1395ff(a)(4)(A).

[34] *See id.* § 1395ff(b)(1)(F) (providing expedited proceedings to individuals who have received notice that their provider of services plans "to terminate services" or "to discharge" them).

16

entitle beneficiaries who are immediately or initially placed into "observation status" to any form of expedited process or administrative review.[36]

Because plaintiffs have failed to allege a plausible statutory violation, we affirm the District Court's dismissal of claims six and seven, to the extent that these claims assert violations of the Medicare Act.

## B. Due Process Claims

Claims six and seven also allege that the Secretary violated plaintiffs' rights under the federal Due Process Clause by: (1) failing to provide, or to require hospitals to provide, written notification informing beneficiaries that they were placed on "observation status"; and (2) failing to provide Medicare beneficiaries with the right to expedited administrative review of their placement on

---

[35] *See* 42 C.F.R. § 405.1205(a)(2) (defining "discharge" as the "formal release of a beneficiary from an inpatient hospital").

[36] The Secretary concedes that beneficiaries who are downgraded from "inpatient" to "observation status" are entitled to expedited process under 42 C.F.R. § 405.1206(a). As to this requirement, however, the complaint only alleges that: (1) a plaintiff who had his status changed did not receive the requisite notice; and (2) another plaintiff who received such notice was not informed of her appeal rights. As the District Court correctly noted, however, "these allegations do not state claims against the Secretary," because the *hospitals* are charged with providing the requisite notice. *Bagnall*, 2013 WL 5346659, at *19 . Accordingly, plaintiffs have failed to allege a plausible claim that, in these two cases, the *Secretary* violated the Medicare Act or any implementing regulation by providing inadequate notice.

17

"observation status." The District Court dismissed these claims on the sole ground that plaintiffs did not possess a property interest in being admitted to their hospitals as "inpatients." Because this determination relied upon a factual finding that could not be made on a motion to dismiss, we vacate the District Court's dismissal of plaintiffs' Due Process claims and remand for limited discovery.

### 1. Legal Standards

The Due Process Clause "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning" of the Fifth Amendment.[37] To state a Due Process claim, a plaintiff must show that: (1) state action (2) deprived him or her of liberty or property (3) without due process of law.[38] Here, the District Court solely focused on whether plaintiffs were deprived of a protected interest in property or liberty.[39]

We have long held that procedural due process protections "attach where state or federal law confers an entitlement to benefits."[40] A "mere 'unilateral expectation'" of receiving a benefit,

---

[37] *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

[38] *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).

[39] Because the District Court concluded that plaintiffs lacked a property interest sufficient to support their Due Process claim, it did not address the other two prongs of the analysis—*i.e.,* state action and due process.

18

however, is not enough—"a property interest arises only where one has a 'legitimate claim of entitlement' to the benefit."[41] In determining whether a given benefits regime creates a "legitimate claim of entitlement" to such benefits, we ask whether the statutes and regulations governing the distribution of benefits "'meaningfully channel[] official discretion by mandating a defined administrative outcome.'"[42] If official discretion is so limited, then the beneficiaries of the governmental program may possess a property interest protected by the Due Process Clause.

For example, in *Kapps*, applicants for New York's Home Energy Assistance Program ("HEAP") claimed that the administrators of HEAP violated their procedural due process rights when they denied their applications for HEAP benefits without a hearing. We found that New York law set "fixed" and "objective" eligibility criteria for the receipt of HEAP benefits—such as income,

---

[40] *Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir. 2005) (citation omitted); *see also Goldberg v. Kelly*, 397 U.S. 254, 262 (1970) (procedural due process applies to the termination of welfare benefits because they are "a matter of statutory entitlement for persons qualified to receive them"); *Kraemer v. Heckler*, 737 F.2d 214, 222 (2d Cir. 1984).

[41] *Kapps*, 404 F.3d at 113 (quoting *Board of Regents of State Colleges v. Roth*, 408 U.S. 456, 577 (1972)).

[42] *Id.* (quoting *Sealed v. Sealed*, 332 F.3d 51, 56 (2d Cir. 2003)); *see also Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 462 (1989) (a "legitimate claim of entitlement" is created by "placing substantive limitations on official discretion" (internal quotation marks omitted)).

household size, and enrollment in other welfare programs—and that anyone who met these eligibility criteria was entitled to receive HEAP benefits. Because these criteria were "precisely the type of discretion-limiting 'substantive predicates' that are the hallmarks of protected property rights," we held that plaintiffs possessed "a valid property interest in the receipt of regular HEAP benefits."[43]

## 2. Analysis

Here, the District Court held that plaintiffs lacked a property interest in being admitted to a hospital as "inpatients," because that decision—whether to admit a patient—is "a complex medical judgment" left to the doctor's discretion. In so concluding, the District Court relied primarily on the Medicare Policy Manual, which states that:

> The physician or other practitioner responsible for a patient's care at the hospital is also responsible for deciding whether the patient should be admitted as an inpatient. Physicians should use a 24-hour period as a benchmark, i.e., they should order admission for patients who are expected to need hospital care for 24 hours or more, and treat other patients on an outpatient basis. However, the decision to admit a patient is a complex medical

---

[43] *Kapps*, 404 F.3d at 113, 118.

judgment which can be made only after the physician has considered a number of factors, including the patient's medical history and current medical needs, the types of facilities available to inpatients and to outpatients, the hospital's by-laws and admissions policies, and the relative appropriateness of treatment in each setting.[44]

The District Court therefore accepted as true the Secretary's assertion that a hospital's decision whether to admit a Medicare beneficiary as an "inpatient" was left to the discretion and "medical judgment" of the treating physician.

However, plaintiffs' complaint contains plausible allegations that, increasingly, admission decisions are *not* left to the discretion or judgment of treating physicians. Specifically, the complaint alleges that the decision to admit a patient to a hospital is—in practice—made through rote application of "commercially available screening tools," as directed by the centers for Medicare and Medicaid Services ("CMS"), which substitutes for the medical judgment of treating physicians.[45] Plaintiffs also allege that CMS exerts pressure on hospitals through its billing policies and through its retroactive "Recovery Audit Contractor" reviews, which give hospitals the incentive—as a cost-saving or compliance measure—to

---

[44] Medicare Policy Manual, Ch. 1, § 10.

[45] Joint App'x 28 (Compl. ¶ 40).

21

place more Medicare beneficiaries into "observation status" for longer periods of time.[46] Therefore, drawing all reasonable inferences in favor of plaintiffs,[47] these allegations show that the Secretary—acting through CMS—has effectively established fixed and objective criteria for when to admit Medicare beneficiaries as "inpatients," and that, notwithstanding the Medicare Policy Manual's guidance, hospitals apply these criteria when making admissions decisions, rather than relying on the judgment of their treating physicians.

Therefore, the dispositive issue—whether plaintiffs possess a property interest sufficient to state a Due Process claim—turns on facts that are, at this stage, contested. If plaintiffs are able to prove their allegation that CMS "meaningfully channels" the discretion of doctors by providing fixed or objective criteria for when patients should be admitted, then they could arguably show that qualifying Medicare beneficiaries have a protected property interest in being treated as "inpatients." However, if the Secretary is correct and, in fact, admission decisions are vested in the medical judgment of treating physicians, then Medicare beneficiaries would lack any such

---

[46] Joint App'x 30 (Compl. ¶¶ 45–50).

[47] *See Carpenters Pension Trust*, 750 F.3d at 232; *see also Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996) ("We take all well-plead factual allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiffs.").

22

property interest.[48] At this stage, it is simply unknown how, in practice, the relevant admissions decisions are made.

The District Court therefore erred in dismissing plaintiffs' Due Process claims at the motion-to-dismiss stage on the sole ground that plaintiffs had failed to satisfy the "property interest" prong of the due process analysis.

To be clear, we take no position on whether plaintiffs ultimately will be able to establish that these hospitals, at the behest of CMS, admitted patients using "fixed" criteria, or that, if they did, these plaintiffs in fact met those criteria. Moreover, we take no position regarding whether plaintiffs have pleaded facts sufficient to establish the other two prongs of the due process analysis which the District Court did not address and are not challenged on appeal— *i.e.*, that the "inpatient" decision constituted state action, and that the process provided to challenge the "inpatient" decision was inadequate. Finally, we take no position regarding what form of notice or administrative review, expedited or otherwise, would be required if Medicare beneficiaries who satisfy the "fixed" criteria are denied admission to a hospital as an "inpatient." However, because plaintiffs have stated a plausible claim that they possessed a property interest in being admitted to their hospitals as "inpatients," they are entitled to test these factual allegations in discovery.

---

[48] *See Sealed*, 332 F.3d at 56 (if the administrative scheme "does not require a certain outcome, but merely *authorizes* particular actions and remedies, the scheme does not create 'entitlements' that receive constitutional protection").

23

Accordingly, we vacate the District Court's dismissal of claims six and seven, to the extent that these claims assert violations of the Due Process Clause.

On remand, the District Court is directed to supervise a limited period of discovery. This discovery period will be focused on the sole issue of whether plaintiffs possessed a property interest in being admitted to their hospitals as "inpatients," which, as stated above, turns on a factual determination—namely, whether the decision to admit these patients to these hospitals was a "complex medical judgment" left to the treating physicians' discretion, or whether, in practice, the decision was made by applying fixed criteria set by the federal government. The District Court will then, in the first instance, determine whether the evidence adduced in discovery establishes that Medicare beneficiaries possess a property interested in being admitted to their hospitals as "inpatients."

In the interest of judicial economy, any renewed appeal in this case will be assigned to this panel. We will, however, only authorize the appeal of a final judgment. If, after this period of discovery, the District Court grants summary judgment to the Secretary on the ground that the evidence *fails* to establish a property interest, an appeal will then be authorized in the normal course.[49] However, if

---

[49] *See* 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ."). However, an exception to the final judgment rule is provided by the "collateral order doctrine," under which there can be an interlocutory appeal of an order that: (1) conclusively determines the disputed question; (2) resolves an important

the District Court concludes that the evidence establishes that plaintiffs do have a property interest, or that there are material issues of fact that preclude summary judgment as to that issue, it is directed to analyze whether the complaint is properly dismissed on the other two prongs of the due process analysis—*i.e.*, "state action" and "due process." If this analysis leads the District Court to dismiss the complaint on either of those two prongs, plaintiffs may also renew their appeal in the normal course.

However, if material issues of disputed fact preclude the grant of summary judgment to either party on the "property interest" prong, and if dismissal is not appropriate on either of the other two prongs, the District Court may permit the parties, to the extent necessary, to engage in additional discovery regarding "state action" and "due process." At the completion of this discovery period, the case shall return to us only upon a final judgment entered by the District Court—either in response to a motion for summary judgment or at the conclusion of whatever trial proceeding is deemed appropriate by the District Court.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the District Court's judgment of October 10, 2013 in part, insofar as it dismissed

issue completely separate from the merits of the action; and (3) is effectively unreviewable on appeal from a final judgment. *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 383–84 (2d Cir. 2006); *see also Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978).

25

plaintiffs' Medicare Act claims, and **VACATE** in part, insofar as it dismissed plaintiffs' Due Process Clause claims, and **REMAND** the cause to the District Court for further proceedings consistent with this opinion. In the interest of judicial economy, any future appeals taken from the District Court's decisions shall be referred to this panel.