FUENTES, Circuit Judge,
Dissenting.
In this case, we must interpret the term “overnight stay” for purposes of defining a serious health condition under the FMLA. The District Court held that an “overnight stay” in a hospital is measured from sunset to sunrise. Based on dictionary definitions, the test leads to results predicated principally on geo-location and the turn of the earth’s axis. The majority rejects this test and I concur. The majority then proposes a new test. It defines “overnight stay” as a hospital stay from one calendar day to the next for a substantial period of time. A “substantial period,” the majority suggests, would be approximately eight hours. I believe this test is as inequitable and unworkable as the one it seeks to replace, and I therefore respectfully dissent.
Jeffrey Bonkowski suffered from a preexisting heart condition and diabetes. On November 14, 2011, he began experiencing shortness of breath and chest pains. In light of his appearance and medical history, Bonkowski’s wife drove him to the hospital just after 11:00 p.m. that evening. Bonkowski arrived at the hospital shortly before midnight. Upon arrival, hospital personnel wheeled Bonkowski into the hospital prior to midnight. Bonkowski was admitted as an “inpatient” shortly after midnight, where he remained until the early evening of November 15, 2011. The hospital performed comprehensive testing, and made contingent preparations for open heart surgery, prior to his- discharge. Under the majority’s rendering, although he spent in excess of fourteen hours in the hospital as an inpatient from admission to discharge, Bonkowski does not qualify for FMLA relief because he was not admitted and discharged from one calendar day to the next. Because he was admitted after midnight, the time he spent in the hospital on the “day” of his arrival, no matter how long, will not count. If, however, he had been admitted to the hospital at 11:00 p.m. on November 14th and was discharged at 7:00 a.m. on November 15th — a total of eight hours — Bonkowski would qualify for relief under the FMLA.
The majority’s approach is impractical, produces inequitable results, and is contrary to the remedial purpose of the FMLA. “Congress enacted the FMLA in response to concern regarding, [among other things], ‘inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods.’ ”[1] The purpose of the FMLA is to “to entitle employees to take reasonable leave for medical reasons,” but in a “manner that accommodates the legitimate interests of employers.”[2] As a remedial statute, the FMLA is to be construed broadly “to extend coverage and [its] exclusions or exceptions should be construed narrowly.”[3] Denying FMLA protection to an employee who enters the hospital one day and remains there much of the day, totaling close to nineteen hours, *212 is, in effect, truncating coverage and construing exceptions broadly. This denial is simply inconsistent with the remedial purpose of the FMLA. While I prefer the majority’s test to the District Court’s test, I find that it removes only the geographical discrepancies implicit in the District Court’s proposed test.
In my view, the majority’s clear, “bright-line” approach is an inequitable one. By defining “overnight stay” based on “one calendar day to the next,” we fail to consider the multitude of factors impacting time of admission and the realities of our health care system. This is evident when we compare and contrast urban and rural hospitals. An urban hospital might be overrun with patients who lack health insurance and seek treatment in an emergency room. Thus, if an employee arrives at an urban hospital, he may be forced to wait hours before admission. Rural hospitals, on the other hand, face their own problems: smaller staffing and fewer beds might cause delays in admission.[4] The majority’s calendar definition also fails to consider seasonal fluctuations in hospitals. For instance, flu season typically peaks in January and February.[5] If an employee falls ill during these months, the employee may face delays in admission not present during other periods in the year.[6]
In addition, an employee may face longer delays in admission depending on the day of the week he visits the hospital. Mondays, for instance, are considered the busiest day of the week, while Thursdays are considered the quietest days.[7] In fact, research has shown that there may be a “weekend effect” that “delays needed hospital care for weekend patients. There is some evidence that hospital mortality is higher on the weekends for certain types of patients.”[8] This may lead “care providers [to] rush to discharge a patient on Friday so that they are out of the hospital *213 by the weekend.”[9] Staffing on the weekend and “off hours” impacts admission and discharge time. Whereas, “[t]he weekday hospital has a full administrative team, department chairs and service chiefs, experienced nurse managers, and a full complement of professional staff,” in contrast “[t]he off-hours hospital ... rarely, if ever, has senior managers present. Nurse-to-patient ratios are significantly lower. Even the number of residents is considerably lower ... based on mandated work-hour restrictions.”[10] Indeed, an employee may be delayed admission based on the time of day he arrives at the hospital. In 2006, the highest percentage of admissions occurred between the hours of 9 a.m. and 5 p.m.[11] A study by a hospital consulting firm proved that patients who arrived in the emergency room between 7 a.m. and 3 p.m. reported higher satisfaction than those who arrived in the evening or overnight hours.[12] “By mid-afternoon, wait times may be on the rise as patient volumes have increased during the day. If a shift change is occurring during a particularly busy time, it may add to any actual or perceived disorganization or delays for patients.” [13] Elective surgeries may result in fewer available beds, further back-logging admission irrespective of the day of week or hour of the day.[14] This practice forces ER patients to be “boarded” in the Emergency Department or in hospital hallways until beds become available.[15] All of these factors impact a patient’s admission and discharge times and yet the majority’s approach is blind to them.
Furthermore, a temporal definition fails to consider transportation issues that may impact admission time. These may include: variances in traffic patterns which may delay an employee’s arrival at the hospital; proximity and travel time to a hospital; availability of public versus private transportation; and seasonal weather issues such as snow storms, which may affect travel.
Finally, the “one calendar day to the next” approach also fails to take into account the intercession of everyday annoyances. For.example, an employee is being driven to the hospital at the onset of his illness, and his transportation becomes disabled. He arrives at the hospital at 12:05 a.m. and remains in the hospital until 7 p.m. the next evening, a total of nineteen hours. This employee would not qualify for FMLA relief. But a separate employee arriving at 11:55 p.m. would merit relief. Or, consider the employee who arrives at 11:55 p.m., but because of staffing problems, the employee is not formally admitted until 12:02 a.m. He would not qualify for FMLA relief. Under the majority’s proposed test, we deny FMLA protections to the employees in both scenarios *214 simply based off a few minutes difference in time of admission.
In light of the myriad problems we face in construing “overnight stay” temporally, I, instead, propose a totality of the circumstances approach. There are many factors probative of an overnight stay in a medical facility. Among the most important is the time an employee is formally admitted to the hospital and the time he is discharged from the hospital. Instead of relying on an arbitrary cut-off time, the court can balance whether the employee was discharged an hour after being admitted, or whether the employee spent fourteen hours in the hospital. Another factor is whether the employee spent at least part of the traditional night hours in the hospital — tracking the DOL’s definition of “inpatient care.” The DOL contemplated an “overnight stay” in a medical facility; thus, spending ten hours during the day from 7 a.m. until 5 p.m. may weigh against a finding of an “overnight stay,” whereas spending ten hours from 7 p.m. until 5 a.m. would weigh in favor of such a finding.
An additional factor is whether admission was followed by an assignment to a room. This factor is used in other contexts, such as Medicaid. Medicaid defines “inpatient” as “a person who has been admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services.”[16] Other relevant factors include the severity of the medical issue presented, whether the hospital ran extensive tests, and the hospital’s classification of the employee as an “inpatient” or “outpatient.” The benefit of this analysis is that a court may assess the entire picture of an employee’s hospital experience and then determine whether that employee is entitled to relief under the FMLA.
The material facts in this case are not in dispute. As previously stated, Bonkowski arrived at the hospital prior to midnight on November 14, and the hospital admitted him as an “inpatient” shortly after midnight. He stayed at the hospital for more than fourteen hours, being discharged in the early evening of November 15. While hospitalized, he underwent comprehensive testing. Under these circumstances, I would conclude that Bonkowski had an overnight stay in the hospital.
The majority fears that the totality of the circumstances approach would make it more difficult for both employers and employees to predict the circumstances that would give rise to an “overnight stay” and could lead to additional litigation in the future with possibly inconsistent results. There are no material issues of fact in Bonkowski’s case, and I believe there will be no material issues of facts in most of these types of cases. Events leading to an employee’s “overnight stay” at a hospital such as travel to the hospital, the day, date and time of arrival, the time the employee signs into the hospital, the time of admittance and discharge, and the employee’s medical report are seldom matters of factual dispute. In such cases, I believe that the district court should be free to consider all of the circumstances presented and conclude whether, as a matter of law, the employee has suffered a “serious health condition.” under 29 U.S.C. § 2111(11)(A).
Several courts have held that whether an employee suffers from a serious health condition is properly considered a question of law.[17]
*215 Similar - to the majority’s approach, where the facts are undisputed in a case, the district court may, in its discretion, quite easily determine whether an employee had an overnight stay in the hospital weighing the factors I proposed. The only difference is that a totality of the circumstances approach simply considers more of the evidence rather than solely the “one calendar day to the next day” approach that the majority proposes. Where material facts in the record are disputed, of course, summary judgment cannot be granted and the case must be submitted to a jury — but this is true under any approach.
For these reasons, I dissent in favor of a totality of the circumstances approach. Unless and until the DOL clarifies the definition of “overnight stay,” this approach offers a practical and more equitable inquiry into an employee’s hospital experience, and one that more fully comports with the remedial purpose of the FMLA.

. Miller v. AT & T Corp., 250 F.3d 820, 833 (4th Cir.2001) (quoting 29 U.S.C. § 2601(a)(4)).

. 29 U.S.C. § 2601(b)(2), (b)(3). This is effectuated by, for instance, requiring an employee to provide adequate notice to the employer. See Lichtenstein v. University of Pittsburgh Medical Center, 691 F.3d 294, 303 (3d Cir.2012). It should not, however, be accomplished by rejecting legitimate claims based on an arbitrary standard.

.Cobb v. Contract Transport, Inc., 452 F.3d 543, 559 (6th Cir.2006).

. The average wait time to see a physician further differs between geographic regions and also by payer type. In 2006, the average wait time to see a physician was as follows: Northeast (56 minutes), Midwest (50 minutes), South (61 minutes), West (49 minutes). When analyzed by payer type, the average wait time was: Private Insurance (55 minutes), Medicare (52 minutes), Medicaid (56 minutes), Worker’s compensation (41 minutes), Self-pay (62 minutes), No charge/charity (81 minutes). U.S. Gov’t Accountability Office, GAO-09-347, Hospital Emergency Department: Crowding Continues to Occur, and Some Patients Wait Longer than Recommended Time Frames 45-46 tbl. 13 (2009). While the difference in minutes appears miniscule, when we operate under the majority’s approach, a minute can make or break an employee's claim.

. http://www.flu.gov/abou1_the_flu/seasonal/ (last visited May 7, 2015). Studies have shown that January appears to be the busiest month of the year in hospitals, whereas November and July are the least busy. Chad S. Kessler, M.D., et al., Predicting Patient Patterns in Veterans Administration Emergency Departments, XII Western Journal of Emergency Medicine 2, at 205 (May 2011).

. The CDC estimates the average wait time for all types of hospital to be over 120 minutes, or two hours, irrespective of these additional factors. This is the time measured from when the patient arrives until he sees a physician. http://www.cdc.gov/mmwr/ preview/mmwrhtml/mm6319a8.htm. Under the majority's approach, minutes are of key concern. Thus, a delay of 120 minutes clearly can impact an employee’s chances of obtaining FMLA relief.

. Kessler, at 205.

. Plan ahead to avoid hospital delays on weekends, The Commercial Appeal (Memphis), Mar. 15, 2010, available at 2010 WLNR 5417578. “Care delays on weekends might be worse if a hospital is already full. Many weekend patients have to wait until Monday or later to get certain tests or procedures.” Id.

. Id.

. David J. Shulkin, M.D., Like Night and Day — Shedding Light on Off-Hours Care, The New England Journal of Medicine (May 2008).

. Kessler at 205.

. Emergency Department Pulse Report 9, available at http://www.pressganey.com/ Documents_secure/Pulse% 20Re-ports/2010_ED_Pulse_Report.pdf. The "[s]taffing patterns, patient volume, and acuity of patient conditions may play a large part in these differences in satisfaction.” Id.

. Id.

. U.S. Gov’t Accountability Office, GAO-09-347, Hospital Emergency Department: Crowding Continues to Occur, and Some Patients Wait Longer than Recommended Time Frames 2 (2009).

. ER wait times endanger health, Asbury Park Press, June 28, 2009, available at 2009 WLNR 15689777.

. Barrows v. Burwell, 777 F.3d 106, 108(2d Cir.2015) (citing Medicare Benefit Policy Manual, CMS Pub. No. 100-02, (“Medicare Policy Manual”) Ch. 1, § 10).

. See, e.g., Alcazar-Anselmo v. City of Chicago, No. 07 C 5246, 2011 WL 3236024, at *2 (N.D.Ill. July 27, 2011) (on summary judgment, analyzing the "continuing treatment by a health care provider” prong of 29 U.S.C. *215 § 2111); Helmick v. Solid Waste Auth. of Cent Ohio, No. 2:07-CV-912, 2009 WL 650417, at *6 (S.D.Ohio Mar. 10, 2009) (same); Whitworth v. Consol. Biscuit Co., No. CIV.A. 6:06-112-DCR, 2007 WL 1075774, at *8 (E.D.Ky. Apr. 6, 2007) ("To establish that she was incapacitated within the meaning of the FMLA, a plaintiff must prove that she suffered from an ‘inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom.’ 29 C.F.R. § 825.114(a)(2)(i). This determination is a question of law, and the plaintiff bears the burden of proving the objective existence of a serious health condition that incapacitated her during the period in question.”).