*Bellin v. Zucker*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2020

(Argued: December 11, 2020     Decided: July 29, 2021)

Docket No. 20-1463

ROSALIND BELLIN, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY
SITUATED,

*Plaintiff-Appellant,*

–v.–

HOWARD A. ZUCKER, M.D., J.D., IN HIS OFFICIAL CAPACITY AS COMMISSIONER,
NEW YORK STATE DEPARTMENT OF HEALTH, ELDERSERVE HEALTH, INC., DBA
RIVERSPRING AT HOME,

*Defendants-Appellees.*

B e f o r e :

POOLER, WESLEY, and CARNEY, *Circuit Judges.*

Plaintiff-Appellant Rosalind Bellin brings this 42 U.S.C. § 1983 action on behalf of
herself and a putative class of similarly situated Medicaid beneficiaries. She alleges that
managed long-term care plans ("MLTCs") that contract with New York State violate
Medicaid beneficiaries' rights under the Fourteenth Amendment Due Process Clause by
denying them the right to appeal an MLTC's initial determination of the personal care

services hours the MLTC will provide the beneficiary if they choose to enroll with the MLTC. Bellin also alleges that beneficiaries are entitled to this appeal right, and to notice of the right, under federal statutory and constitutional law. Bellin brings her claims against Defendant-Appellee ElderServe Health, Inc. (d/b/a RiverSpring at Home), an MLTC that she alleges denied her these rights, and Defendant-Appellee Howard A. Zucker, in his official capacity as Commissioner of the New York State Department of Health, for his alleged failure to enforce these asserted rights.

The district court (Hellerstein, *J.*) granted Defendants-Appellees' motions to dismiss Bellin's complaint. The district court dismissed Bellin's federal law claims on the grounds that the relevant federal statutes do not provide Medicaid beneficiaries a right to appeal initial personal care services hours determinations. We affirm this aspect of the judgment. The district court also dismissed Bellin's Fourteenth Amendment due process claims after concluding that Bellin did not plausibly allege a constitutionally protected property interest in an MLTC's determination of a particular number of personal care services hours. We vacate this aspect of the district court's judgment and remand, holding that Bellin plausibly alleged a constitutionally protected property interest in the determination of her personal care services hours.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

———————

AYTAN Y. BELLIN (Nina Keilin, Law Office of Nina Keilin, New York, NY, *on the brief*), Bellin & Associates LLC, White Plains, NY, *for Plaintiff-Appellant Rosalind Bellin*.

CAROLINE A. OLSEN, Assistant Solicitor General of Counsel, Barbara D. Underwood, Solicitor General, New York State Office of the Attorney General, New York, NY, *for Defendant-Appellee Howard A. Zucker*.

BRIAN T. MCGOVERN (Mara R. Lieber, *on the brief*), Crowell & Moring LLP, New York, NY, *for Defendant-Appellee ElderServe Health, Inc., DBA RiverSpring at Home*.

Martha Jane Perkins and Sarah Somers, National Health Law Program, Chapel Hill, NC; Alice Bers, Center for Medicare Advocacy, Willimantic, CT, *for National Health Law Program, Center for Medicare Advocacy, and*

*Justice in Aging, Amici Curiae in support of Plaintiff-Appellant Rosalind Bellin.*

Benjamin W. Taylor, New York Legal Assistance Group, New York, NY, *for Empire Justice Center and New York Legal Assistance Group, Amici Curiae in support of Plaintiff-Appellant Rosalind Bellin.*

———————

CARNEY, *Circuit Judge*:

Plaintiff-Appellant Rosalind Bellin brings this 42 U.S.C. § 1983 action on behalf of herself and a putative class of similarly situated Medicaid beneficiaries. She alleges that managed long-term care plans ("MLTCs") that contract with New York State violate Medicaid beneficiaries' rights under the Due Process Clause of the Fourteenth Amendment by denying them the right to appeal initial determinations of the personal care services hours the MLTCs will provide them if they choose to enroll. Bellin also alleges that beneficiaries are entitled to this appeal right, and to notice of the right, under federal Medicaid statutes. Bellin brings her claims against Defendant-Appellee ElderServe Health, Inc. (d/b/a RiverSpring at Home) ("RiverSpring"), an MLTC that she alleges denied her these rights, and Defendant-Appellee Howard A. Zucker, in his official capacity as Commissioner of the New York State Department of Health (the "State"), for his alleged failure to enforce these rights.

The district court (Hellerstein, *J.*) granted Defendants-Appellees' motions to dismiss Bellin's complaint, concluding that the federal statutes do not provide Medicaid beneficiaries with a right to appeal initial personal care services hours determinations. It dismissed Bellin's due process claims after concluding that Bellin did not plausibly allege a constitutionally protected property interest in an MLTC's initial determination of a particular number of care hours. We agree that the federal statutes do not

3

guarantee the appeal right Bellin asserts, but we conclude that the district court's dismissal of Bellin's due process claims was premature.

When the State determines that a New York Medicaid beneficiary like Bellin is eligible on a long-term basis for in-home assistance with personal care needs, the administrative scheme provides that the beneficiary then contacts one or more MLTCs for an evaluation. After the evaluation, each MLTC determines how many hours of care it will provide per week as an initial matter if the beneficiary chooses to enroll in its program. The current administrative regime establishes no mechanism for beneficiaries to appeal the MLTCs' initial care hours determinations. If a beneficiary receives offers for care hours that are in her view insufficient, she has no choice but to enroll and begin receiving care at an inadequate level (perhaps supplementing state-covered care with private care pending any later adjustment). After beginning care with an MLTC, she may request additional care hours. She then waits for the MLTC to rule on the request. If her request is accepted, she begins receiving care at the adjusted level, having done without or paid privately for care in the interim. If the adjustment is denied, she may internally appeal to the MLTC. If the appeal fails, she has recourse to an appeal in the form of a New York State "fair hearing," under the State's Medicaid regulations.

Bellin plausibly alleged that MLTCs' discretion in making initial personal care hours determinations is meaningfully channeled by contract, regulation, and related authorities such that beneficiaries have a constitutionally protected property interest in the number of hours an MLTC initially determines they are entitled to receive. Records from fair hearings in Bellin's case and others lend further support to the view that, at least in some cases, New York State is able to determine based on MLTCs' assessment records that a beneficiary is entitled to a particular number of care hours above what the MLTC initially determined.

We therefore vacate the district court's dismissal of Bellin's due process claims and remand for further consideration of the limits on MLTCs' discretion in making initial determinations of personal care hours, as well as for consideration of whether the current system adequately protects any property interest beneficiaries may have in those care hours. We reject Bellin's federal statutory claims.

The district court's judgment is AFFIRMED with respect to Bellin's federal law claims, VACATED with respect to Bellin's due process claims, and the action is REMANDED for further proceedings consistent with this Opinion.

## BACKGROUND

I.      **Bellin's Application for Personal Care Services**

Rosalind Bellin is a woman in her early 80s who lives alone in the Bronx, New York. She suffers from several serious illnesses that limit her ability to care for herself independently. In 2019, believing that she needed in-home care 24 hours a day, Bellin applied for personal care services through the joint federal-state health care program commonly known as Medicaid. *See* 42 U.S.C. § 1396 *et seq.*

In Medicaid jargon, the term "personal care services" refers to in-home assistance with personal care that is provided to people whose health conditions might otherwise require that they reside in a nursing home.[1] In New York State, personal care services

---

[1] *See* N.Y. Comp. Codes R. & Regs. tit. 18, § 505.14(a)(1) (defining personal care services as "assistance with nutritional and environmental support functions and personal care functions" that are "essential to the maintenance of the patient's health and safety in his or her own home"); CTRS. FOR MEDICARE & MEDICAID SERVS., *Personal Care Services (PCS)* (July 15, 2020), https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Program/Education/Personal-Care-Services (explaining that personal care services "are provided to eligible beneficiaries to help them stay in their own homes and communities rather than live in institutional settings, such as nursing homes"). To minimize the burden of

5

for individuals like Bellin are provided by MLTCs, entities that act under contract with the State. *See* N.Y. Pub. Health Law § 4403-f(7)(b). Under New York law, the State pays each MLTC a fixed sum—a "capitation"—for each beneficiary that it enrolls. Jt. App'x 16. Each MLTC bears the financial risk that the cost of a beneficiary's care will exceed the capitation amount.[2]

When a Medicaid beneficiary seeks personal care services,[3] she is first evaluated by New York's Conflict-Free Evaluation and Enrollment Center ("CFEEC"), a single, state-wide organization charged with determining whether the beneficiary is qualified to receive such services.[4] Bellin was evaluated by the CFEEC and determined eligible to receive personal care services.[5]

---

acronyms in this discussion, we will refer to these services simply as "care services" or "personal care services."

[2] *See* Antonia C. Novello, N.Y. STATE DEP'T OF HEALTH, *New York State Management Long-Term Care, Interim Report to the Governor and Legislature* at 20 (May 2003) ("2003 Interim Report"), https://www.health.ny.gov/health_care/managed_care/mltc/reports.htm (last visited July 8, 2021) ("One of the innovative aspects of the managed long-term care demonstrations is the use of an insurance or 'risk' model where plans are paid a predetermined amount per member per month (PMPM), and in return must manage and pay for all services included in the benefit package. This PMPM amount is referred to as the monthly capitation rate."). The payment structure is described in the Department of Health's draft model contract for use with MLTCs. *See* N.Y. STATE DEP'T OF HEALTH, *Managed Long Term Care Partial Capitation Contract*, art. VI(A), https://www.health.ny.gov/health_care/medicaid/redesign/mrt90_partial_capitation_contract.htm#a6 (last visited July 8, 2021) ("The monthly capitation payment to the Contractor shall constitute full and complete payments to the Contractor for all services that the Contractor provides pursuant to this Agreement."). As the State observes, the capitation payments in New York are risk-adjusted so that MLTCs serving high-risk populations receive higher per-enrollee payments than those in less needy areas.

[3] For clarity, we underscore that those seeking personal care services in this way must already have been acknowledged by the State as qualified to receive Medicaid services.

[4] CFEEC evaluations are conducted by Maximus, Inc., as of this writing.

[5] In this evaluation, the CFEEC relies on New York's Uniform Assessment System ("UAS" or "assessment system"). *See* N.Y. STATE DEP'T OF HEALTH, MLTC POLICY 15.08: CONFLICT-FREE

Once determined eligible, a beneficiary has 75 days to enroll with an MLTC.[6] She may apply to one MLTC or many.[7] Each MLTC applied to by the beneficiary must conduct a "comprehensive assessment" of the beneficiary's "medical, social, cognitive, and environmental needs," relying in large part on the State's Uniform Assessment System ("UAS" or "assessment system"). N.Y. Pub. Health Law § 4403-f(7)(g)(i); N.Y. STATE DEP'T OF HEALTH, MLTC POLICY 13.09: TRANSITION OF SEMI-ANNUAL ASSESSMENT OF MEMBERS TO UNIFORM ASSESSMENT SYSTEM FOR NEW YORK (Apr. 26, 2013), https://www.health.ny.gov/health_care/medicaid/redesign/mltc_policy_13-09.htm (last visited July 8, 2021) (requiring MLTCs to use the assessment system). The assessment is performed in the beneficiary's home by a registered nurse. It produces a "Nursing Facility Level of Care" ("NFLOC" or "Level of Care") score; the higher the score, the greater the beneficiary's need for care. Based on the results of the assessment, the MLTC determines the services it will provide, including the number of daily hours of personal care services, if the beneficiary chooses to enroll with that MLTC.

---

EVALUATION & ENROLLMENT CENTER DISPUTE RESOLUTION (Dec. 29, 2015), https://www.health.ny.gov/health_care/medicaid/redesign/mltc_policy_15-08.htm (last visited July 8, 2021). The UAS, discussed *infra*, is a mechanism for assessing Medicaid beneficiaries' particular care needs. It is designed to produce consistent and standardized results in the assessment task. *See* N.Y. STATE DEP'T OF HEALTH, *Medicaid Redesign: Uniform Assessment System for Long-Term Care in New York State* (Oct. 2019), https://www.health.ny.gov/facilities/long_term_care/uniform_assessment_system/ (last visited July 8, 2021).

[6] If the beneficiary does not select a long-term care plan within that time, she must be reevaluated by the CFEEC. *See* N.Y. STATE DEP'T OF HEALTH, MLTC POLICY 16.08 (Dec. 16, 2016), https://www.health.ny.gov/health_care/medicaid/redesign/mrt90/mltc_policy/16-08.htm (last visited July 8, 2021).

[7] As of April 2021, New York State's Department of Health website reflected that it was contracting with between 40 and 50 MLTCs. *See* N.Y. STATE DEP'T OF HEALTH, *Managed Long-Term Care Plan Directory* (Apr. 2021), https://www.health.ny.gov/health_care/managed_care/mltc/mltcplans.htm (last visited July 8, 2021).

In April 2019, Bellin contacted RiverSpring after another MLTC gave her a care hours determination that she felt was too low. On May 8, a registered nurse from RiverSpring assessed Bellin's personal care services needs using the assessment system. The RiverSpring nurse concluded that Bellin required eight hours of care services daily. When the nurse told Bellin that this was her recommendation, Bellin's daughter protested on Bellin's behalf, arguing that Bellin required substantially more hours of daily care. Still, one week later, on May 15, Bellin's daughter formally requested enrollment with RiverSpring. Bellin began receiving personal care from RiverSpring in her home, eight hours per day, on June 1, two weeks after she requested enrollment.

## II.    Bellin's Appeal Attempts

Before she began receiving RiverSpring's personal care services, Bellin tried to appeal the initial determination that she was entitled to eight hours of personal care services per day and no more. On May 22, 2019, Bellin's attorney contacted RiverSpring asking to appeal its initial determination. RiverSpring responded that Bellin could not then appeal because Bellin was not yet enrolled in RiverSpring. She would be "enrolled" and able to appeal only after June 1, when her care began, they advised.

On June 3, Bellin's attorney again contacted RiverSpring about appealing the initial determination. RiverSpring responded by letter dated June 4, entitled "NOTICE OF NON-CONSIDERATION OF APPEAL." Jt. App'x 22. The June 4 letter said that Bellin's "request for an appeal regarding the personal care [services] hours assigned at enrollment" could not be processed because "an Initial Adverse Determination (IAD) from the Plan regarding [the] request for additional [care service] hours has not been issued." *Id.* It further stated that it would construe Bellin's attempted appeal as a request for additional hours and would adjudicate that request. In other words, RiverSpring now maintained that, even once her care began on June 1, Bellin was not

8

entitled to appeal its initial personal care services hours determination. Instead, she was entitled to request additional personal care services hours prospectively and have RiverSpring adjudicate that request alone.

RiverSpring then assessed Bellin a second time, on June 15, and concluded that her condition had not changed and her care hours should not be increased. According to RiverSpring, Bellin's daughter contacted the company three days later, informing the company that Bellin's condition had worsened and that Bellin was newly wheelchair-bound. About three weeks later, on July 10, the company assessed Bellin a third time. Based on that assessment, it concluded that Bellin required 24-hour care. On July 12, RiverSpring notified Bellin of that conclusion. It began providing Bellin full-time, live-in care on July 23.

## III.    Complaint

Bellin filed this putative class action complaint on June 18, 2019, the same day RiverSpring claims to have learned about a deterioration in Bellin's condition that confined her to a wheelchair. Bellin asserts that Medicaid beneficiaries who need personal care services have the right under law to appeal initial determinations of their personal care services hours made by MLTCs and to receive notice of that right to appeal. She alleges that the State failed to enforce these rights and that Defendant RiverSpring violated these rights by failing to process internal appeals when they were requested and, relatedly, by failing to provide notice of the right to appeal. Bellin brings the action under 42 U.S.C. § 1983, asserting that the State and RiverSpring's actions violate her and the putative class members' rights under the Due Process Clause of the Fourteenth Amendment, as well as under various federal statutes governing Medicaid

beneficiaries' rights to appeal.[8] Bellin seeks to represent a class of "current and future New York State Medicaid recipients who have applied or will apply for Medicaid-funded personal care services from MLTCs" and a sub-class of those Medicaid recipients "who have applied or will apply for Medicaid-funded personal care services from RiverSpring." Jt. App'x 23. She seeks declaratory and injunctive relief instructing the State to enforce class members' rights to appeal MLTCs' initial personal care hours determinations and to receive notice of those appeal rights, and ordering RiverSpring to provide notice of that right and process any such appeals. She also seeks attorney's fees and costs.

## IV. Fair Hearing Appeal

In a separate administrative appeal (the "fair hearing appeal") filed with the State on July 5, 2019, Bellin contested RiverSpring's determination that she was entitled to only eight hours of daily personal care services in the roughly six-week-period from June 1, 2019, through July 12, 2019. In deciding Bellin's appeal, the Commissioner's designee reviewed RiverSpring's assessments and ruled for Bellin.[9]

In a written decision dated September 23, 2019, he determined that neither RiverSpring's May 2019 assessment (completed before Bellin enrolled), nor the June 2019 assessment (completed after Bellin enrolled and requested more care hours) supported the conclusion that Bellin was entitled to only eight hours of care per day at

---

[8] Bellin charged that the denial of appeal rights and related notice violated 42 U.S.C. § 1396a(a) (requiring states to provide review of adverse Medicaid benefits determinations in fair hearings), 42 U.S.C. § 1396u-2 (authorizing expanded use of managed care organizations in Medicaid and outlining required appeal rights), and federal regulations issued by the Centers for Medicare & Medicaid Services ("CMS") in conjunction with these statutes. We discuss these provisions in greater detail below.

[9] Fair hearing appeals in the Department of Health are decided by Commissioner Zucker or his designees. *See* N.Y. Comp. Codes R. & Regs. tit. 18, §§ 358-5.6(a)-(b), 358-6.1(a).

those times.[10] He found that "the Plan's [i.e., RiverSpring's] own documentation" did not support that Bellin became eligible for 24-hour care due to a "change in circumstances [that] came to light" only after the July assessment. Jt. App'x 81. Rather, RiverSpring's initial evaluation of Bellin in May 2019 supported a need for overnight care, he wrote, citing documentation of Bellin's various health conditions and her need for "hands-on assistance with walking and locomotion." *Id.* at 80. He concluded, "The record does not support the Plan's determination not to provide twenty-four (24) hour daily assistance from the start of [Bellin's] enrollment with the Plan on June 1, 2019." *Id.* at 81. He therefore ordered "retroactive authorization" of 24-hour, live-in care as of June 1, 2019—when Bellin first began receiving care services from RiverSpring.[11] *Id.* at 82. Notably, in reaching this conclusion, the designee rejected RiverSpring's argument that "appeal was not . . . available" to Bellin immediately after the initial determination. *Id.*

---

[10] Bellin's fair hearing appeal decision and amended decision, which were included in the parties' joint appendix on appeal, as well as other fair hearing decisions we discuss below, are public records properly subject to judicial notice under Federal Rule of Evidence 201(b). *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) (explaining that district court entitled to consider "matters of which judicial notice may be taken under [Federal Rule of Evidence] 201" in deciding a Rule 12(b)(6) motion to dismiss). We do not take judicial notice of Bellin's fair hearing appeal record and other fair hearing decisions for the "truth of the matters asserted." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). Bellin filed the Commissioner's designee's initial fair hearing decision in the district court as part of her opposition to the State's and RiverSpring's motions to dismiss. *See* Declaration of Aytan Y. Bellin, Exs. A, B, *Bellin v. Zucker*, 457 F. Supp. 3d 414 (S.D.N.Y. 2020) (No. 19-cv-5694 (AKH)), ECF No. 45. The record before the district court did not include the amended fair hearing decision discussed here.

[11] Under certain circumstances, retroactive authorization will entitle a recipient to reimbursement for expenses incurred while care was denied. *See* N.Y. Comp. Codes R. & Regs. tit. 18, § 360-7.5(a)(3). According to Bellin's counsel, Bellin's daughter and son-in-law paid for Bellin to receive additional care from June 1 through the date that RiverSpring began to provide it. *See* Appellant's Br. 7. The issue of reimbursement not having been raised on appeal, we express no opinion about Bellin's entitlement to it.

11

at 81. Instead, the designee explained that Bellin "ha[d] a right to contest the adequacy of the" initial determination "from the moment" RiverSpring provided it. *Id.*

New York State sought reconsideration. In an amended decision dated March 26, 2020, a different Commissioner's designee did not disturb the earlier factual findings regarding Bellin's needs. He did, however, move the retroactive authorization date from June 1 to June 18. He explained that the original decision was erroneous in its conclusion that Bellin had a right to appeal RiverSpring's initial determination. Upon reconsideration, he ruled that Bellin had no right to appeal the initial determination, even after she was enrolled and began receiving care. Rather, her request was properly treated as a request to increase her care hours dated to June 4. He reasoned that, as a result, RiverSpring should have issued its adverse determination denying her June 4 request within 14 days. It failed to do so.[12] Bellin therefore was entitled to retroactive authorization of fulltime live-in care dating back only to June 18—14 days after her June 4 request.

## V.     District Court Proceedings

In a memorandum and order issued in April 2020, the district court granted the defendants' motions to dismiss for failure to state a claim. As to Bellin's § 1983 due process claims, it reasoned that she "did not have a property interest in a particular level of care," and therefore was not unlawfully denied a property right by the State's and RiverSpring's appeal procedures. *Bellin v. Zucker*, 457 F. Supp. 3d 414, 422 (S.D.N.Y.

---

[12] On June 18, 2019, RiverSpring extended the time for decision another 14 days. The Commissioner's designee found that the circumstances satisfied none of the statutory bases permitting that extension, making June 18, 2019, the operative date of the adverse determination. (RiverSpring did not ultimately deny Bellin's request 14 days after June 18 either: it was only on July 15, almost one month later, that RiverSpring finally denied Bellin's request for additional services based on her June request and granted it as of July 13, citing the claimed change in her condition.)

2020).[13] As to her federal statutory claims, it concluded that the relevant statutes do not guarantee Medicaid beneficiaries the right to appeal MLTCs' initial care hours determinations.

Bellin timely appealed.

## DISCUSSION

We review *de novo* the grant of a motion to dismiss. *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013). In so doing, "we 'must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)). We draw all reasonable inferences in the plaintiff's favor to determine whether the plaintiff stated a plausible claim to relief. *See Fink*, 714 F.3d at 740-41. Whether an action is moot is a legal question that we address *de novo*. *White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163, 167 (2d Cir. 2007).

## I.    Mootness

The State presses the position that, because Bellin is now receiving 24-hour, live-in care from RiverSpring, this case is moot. The district court rejected this argument, concluding that Bellin's suit satisfied the exception to the mootness doctrine for inherently transitory claims. Under this exception, "a case will not be moot, even if the controversy as to the named plaintiffs has been resolved, if: (1) it is uncertain that a claim will remain live for any individual who could be named as a plaintiff long

---

[13] In quotations from caselaw and the parties' briefing, this Opinion omits all quotation marks, alterations, and citations, unless otherwise noted.

enough for a court to certify the class; and (2) there will be a constant class of persons suffering the deprivation complained of in the complaint." *Salazar v. King*, 822 F.3d 61, 73 (2d Cir. 2016); *see also Klein ex rel. Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 223 (2d Cir. 2018).

We agree with the district court that Bellin's claims fall squarely within this exception.[14] The current administrative system precludes Medicaid beneficiaries from appealing initial care hours determinations made by MLTCs. They must instead accept the MLTC's initial determination and request additional hours once their personal care services begin. Federal regulations call for MLTCs in most circumstances to rule on these requests within fourteen or twenty-eight days. *See* 42 C.F.R. § 438.210(d)(1).[15] As the district court recognized, however, any named plaintiff who, like Bellin, believes that the MLTC's initial determination denies her the appropriate number of care service hours and who attempts to internally appeal that determination is likely to have her attempt narrowly construed as a request for additional hours in the future. That request will likely be adjudicated within the first month of her care, but one month is generally not enough time to sue and obtain class certification in federal court. *See Salazar*, 822 F.3d at 73-74. Meanwhile, a large number of present and future enrollees who seek more care hours than MLTCs initially determine they are entitled to receive—a "constant class of persons"—is harmed by the denial of the asserted right to appeal those determinations. *Id.* at 73.

---

[14] A reimbursement claim for the period through June 18 might also affect the possible mootness of this dispute, but as noted above, Bellin did not press for reimbursement in her suit or attempt to pursue it on appeal. *See* note 11, above.

[15] An MLTC may take 28 days to adjudicate a request if the "enrollee, or the provider, requests extension" or if the MLTC "justifies (to the State agency upon request) a need for additional information and how the extension is in the enrollee's interest." 42 C.F.R. § 438.210(d)(1)(i)-(ii).

The State observes that another named plaintiff's claims *might not* become moot if that plaintiff's request for additional hours is denied. Therefore, according to the State, Bellin's claims do not fall within the "inherently transitory" exception to mootness. It is true that a plaintiff seeking additional care services hours—particularly one with a meritless claim—might not receive her requested additional hours before a plaintiff class can be certified and therefore might be able to serve as class representative of a suit that is not moot. But this argument draws the "inherently transitory" exception too narrowly. To take advantage of this exception to the mootness doctrine, a plaintiff need not show that every hypothetical plaintiff's claim faces certain dismissal. The standard articulated in *Salazar* requires no more than that it be "uncertain that a claim will remain live for any individual who could be named as a plaintiff." 822 F.3d at 73; *see also Robidoux v. Celani*, 987 F.2d 931, 938-39 (2d Cir. 1993) (holding that recipients of public assistance challenging delays by the Vermont Department of Social Welfare could proceed under the "inherently transitory" exception in part because "the Department will *almost always* be able to process a delayed application before a plaintiff can obtain relief through litigation" (emphasis added)); *Zurak v. Regan*, 550 F.2d 86, 92 (2d Cir. 1977) (applying exception to mootness doctrine when there was "a *significant possibility* that any single named plaintiff would be released prior to certification" (emphasis added)).

There is a "significant possibility" that any plaintiff who brings the claims Bellin asserts here would have her request for additional care hours resolved before a decision on class certification could be made. *Zurak*, 550 F.2d at 92. Even more persuasive, plaintiffs with strong arguments that they have been denied the appropriate number of care hours are particularly likely to have their claims mooted, undermining the underlying purposes of this class action lawsuit.

The State also urges that Bellin's case became moot "for reasons unique to her rather than for reasons that would be common for the putative class." State Br. 26. According to the State, Bellin became entitled to additional personal care hours only after RiverSpring's initial assessment, when (as the State recounts) her medical condition deteriorated. As detailed above, however, in Bellin's fair hearing appeal the Commissioner's designee found that RiverSpring's own records supported Bellin's entitlement to 24-hour care as of RiverSpring's first assessment of Bellin in May 2019; the records did not support the conclusion that Bellin became entitled to increased care as a result of changed medical circumstances. Even on reconsideration, the second designee did not disturb these factual findings. The State's additional mootness argument therefore has no force. The district court thus did not err by determining that Bellin's action could proceed.

## II.    Bellin's Due Process Claims

Bellin challenges the district court's dismissal of her § 1983 claims alleging a due process right to appeal MLTCs' initial personal care services hours determinations. A plaintiff states a due process claim by plausibly alleging that "(1) state action (2) deprived him or her of liberty or property (3) without due process of law." *Barrows v. Burwell*, 777 F.3d 106, 113 (2d Cir. 2015); *see also Kapps v. Wing*, 404 F.3d 105, 112 (2d Cir. 2005) ("In adjudicating [a procedural due process] claim, we consider two distinct issues: 1) whether plaintiffs possess a liberty or property interest protected by the Due Process Clause; and, if so, 2) whether existing state procedures are constitutionally adequate."). Bellin alleged in her complaint that "Zucker exercises significant control over the MLTCs" and "the MLTCs are not simply regulated by state and federal law, they are deeply integrated into the regulatory scheme provided for under federal and state law." Jt. App'x 20. Neither the State nor RiverSpring contests that RiverSpring is a state actor in this context. *See, e.g., Catanzano by Catanzano v. Dowling*, 60 F.3d 113, 119

(2d Cir. 1995) (holding that actions of New York State-certified home health agencies constituted state action in part because those agencies were "the only entities permitted to provide home health care under Medicaid, and are required to evaluate all potential recipients," and their decisions with respect to beneficiaries were guided by regulation in addition to medical judgment). The district court did not reach the third prong of the due process test because it held that Bellin lacks a property interest "in a particular level of care."[16] *Bellin*, 457 F. Supp. 3d at 422. As explained below, the district court's conclusion may ultimately prove to be correct, but its determination at the motion-to-dismiss stage was premature.

A.      Constitutionally Protected Property Interests

A constitutionally protected interest exists where "one has a legitimate claim of entitlement to the benefit"; "[a] mere unilateral expectation of receiving a benefit" does not suffice. *Kapps*, 404 F.3d at 113. To determine whether an applicant for benefits has a constitutionally protected property interest in the receipt of a particular benefit, a court must "look to the statutes and regulations governing the distribution of benefits" and determine whether "those statutes or regulations meaningfully channel official discretion by mandating a defined administrative outcome." *Id.*; *see Sealed v. Sealed*, 332 F.3d 51, 56 (2d Cir. 2003) ("In evaluating whether a state has created a protected interest

---

[16] Before reaching this conclusion, the district court expressed skepticism about whether Bellin, as an applicant for benefits, could have a constitutionally protected property interest in receiving benefits at all. *See Bellin*, 457 F. Supp. 3d at 422-23 ("The Supreme Court has not announced a property interest in cases like Plaintiff's because '[t]he Supreme Court has repeatedly reserved decision on the question of whether *applicants* for benefits (in contradistinction to *current recipients* of benefits) possess a property interest protected by the Due Process Clause.'" (quoting *Kapps*, 404 F.3d at 115)). The district court's skepticism was misplaced. In *Kapps*, we acknowledged that the "Supreme Court has repeatedly reserved decision on the question," but we then observed that "[e]very circuit to address the question . . . has concluded that applicants for benefits, no less than current benefits recipients, may possess a property interest in the receipt of public welfare entitlements." *Kapps*, 404 F.3d at 115.

in the administrative context, we must determine whether the state statute or regulation at issue meaningfully channels official discretion by mandating a defined administrative outcome."). In addition to the relevant statutes and regulations, we must consider the regulatory scheme as a whole: just as discretion may be channeled by law, it may also be channeled by informal rules or institutional practices. *See Furlong v. Shalala*, 156 F.3d 384, 395 (2d Cir. 1998) ("[P]roperty interests may be established through such diverse sources as unwritten common law and informal institutional policies and practices."); *see also Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) (explaining that "[p]roperty interests . . . are not created by the Constitution," but rather by "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits").

This inquiry involves two questions, corresponding to two distinct uses of the word "discretion." First, "discretion" may refer to a decision-maker's ultimate power to decide—the power to grant or deny a benefit regardless of whether particular criteria are met. When the decision-making authority is accorded such wholesale discretion, a procedural due process claim based on the decision-making process will fail. *See Sealed*, 332 F.3d at 56 ("Where the administrative scheme does not require a certain outcome, but merely *authorizes* particular actions and remedies, the scheme does not create 'entitlements' that receive constitutional protection under the Fourteenth Amendment."). Second, "discretion" may refer to the extent to which criteria govern and limit a decision-maker's power to decide—whether the prescribed criteria are open-ended and subjective, or determinate and well-defined. When this more restricted type of discretion is at issue, the procedural due process inquiry turns on the question—in an admittedly somewhat circular inquiry—whether the relevant criteria "*meaningfully channel* official discretion" to an extent sufficient to create a property interest. *Kapps*, 404

18

F.3d at 113 (emphasis added); *see also Bd. of Pardons v. Allen*, 482 U.S. 369, 375 (1987) (explaining the "two entirely distinct uses of the term discretion": (1) where an official "'is simply not bound by standards set by the authority in question,'" and (2) whether an official "'must use judgment in applying the standards set . . . by authority'" (quoting RONALD DWORKIN, TAKING RIGHTS SERIOUSLY 31-32 (1977))).

### 1. *The District Court's Ruling*

The district court alluded to the presence of both types of discretion in MLTCs' decision-making authority. It suggested that MLTCs have ultimate discretion to decide whether to offer a particular number of personal care hours. *See Bellin*, 457 F. Supp. 3d at 423 ("[T]he regulations and agency guidance describe when 24-hour care may be authorized; they do not state that it must be offered."). It also implied that the relevant regulations do not sufficiently channel MLTCs' assessments of beneficiaries' personal care services needs so as to create a constitutionally protected property interest. *See id.* (explaining that Bellin failed to allege a "scheme to channel discretion in MLTCs' personal care determinations").

The district court also pointed to two other aspects of the personal care services assessment scheme as relevant to its conclusion: the fact that beneficiaries have the option of seeking and choosing among multiple MLTC offers, and the fact that MLTCs may compete with one another to sign up beneficiaries. *See id.* (pointing to "choice on the part of the potential Medicaid enrollee, and the possibility of competition among MLTCs as to the quantity and quality of care each proposes to offer" as reasons beneficiaries lack a constitutionally protected due process interest in the initial determination of their care services hours).

On appeal, the State and RiverSpring do not substantially defend the district court's suggestion that MLTCs possess the ultimate discretion to grant or deny care

services hours regardless of whether certain criteria are satisfied.[17] They instead argue that MLTCs' initial determinations of personal care services hours involve the application of fluid, subjective criteria and specialized medical judgment such that their discretion is not "meaningfully channeled." We consider this argument below, ultimately concluding that Bellin has plausibly alleged that MLTCs lack both this type of unbounded discretion as well as the sort of "ultimate" discretion that the district court suggested they have.

### 2. *Meaningfully Channeled Discretion*

As explained above, determining the extent to which decision-makers' discretion is channeled demands a careful examination of the required decision-making process. In *Barrows v. Burwell*, for example, this Court considered whether Medicare beneficiaries have a constitutionally protected property interest in being admitted to hospitals on an inpatient basis as opposed to being placed on observation status, a decision that substantially alters their responsibility under Medicare for the cost of their treatment.

---

[17] Both the State and RiverSpring's briefs could be read to imply that MLTCs are never under an obligation to provide a particular number of personal care services hours—that they possess the sort of "ultimate" discretion that absolutely precludes a constitutionally protected property interest. Upon closer examination, however, both parties' arguments are simply variations on their claims that the relevant personal care services hours criteria are too fluid and subjective to create a constitutionally protected property interest in any particular number of hours. For example, RiverSpring suggests in passing that under New York regulations "the conferral of the benefit . . . never becomes mandatory." RiverSpring Br. 32. Yet, in support of this contention, RiverSpring cites the facts that "a nurse conducting a [uniform assessment] considers numerous data points," that "two individuals with the same [uniform assessment] score may" receive different assessments, and that "different plans may assess the required number of hours differently for [different] individuals." RiverSpring Br. 32. In much the same way, the State highlights "precatory language throughout the statutory and regulatory framework," but in the end argues only that this language "reinforces the absence of a predetermined outcome." State Br. 53. Neither party argues that the MLTC has the option under its contract with the State to deny providing a given level of personal care services altogether to an individual who qualifies for that level of care.

777 F.3d 106, 107-09 (2d Cir. 2015). The district court held that because the decision whether to admit a patient was a "complex medical judgment" committed to the discretion of hospital physicians, beneficiaries have no constitutionally protected property interest in being admitted. *Id.* at 114. In support of this conclusion, it pointed to the Medicare Policy Manual, published by the Centers for Medicare & Medicaid Services ("CMS"), which specifically stated that the decision whether to admit a patient was a "complex medical judgment" based on a physician's application of various factors. *Id.*

This Court held that the district court's dismissal of the action for failure to state a claim was premature. The *Barrows* plaintiff alleged that, despite the CMS guidance, admissions decisions were in fact made "through rote application of 'commercially available screening tools,'" which, *in practice*, "substitute[d] for the medical judgment of treating physicians." *Id.* In light of this allegation, we explained, the district court could not fairly rely on the Medicare Policy Manual to serve as an accurate representation of the admissions procedures. Otherwise stated, whether the plaintiffs had a constitutionally protected property interest "turn[ed] on facts that [were], at th[at] stage, contested." *Id.* at 115. The *Barrows* Court recognized that a protected property interest can arise in a number of ways and that it is important for district courts to consider the details of the administrative scheme—and the allegations regarding those details— before relying on general discretion-granting regulations to dismiss procedural due process claims. Accordingly, although "[t]he issue of whether an individual has such a property interest is a question of law," *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 192 (2d Cir. 1994), *Barrows* and other precedents make clear that when a complaint plausibly alleges discretion is meaningfully channeled based on the relevant sources, including

21

informal institutional policies and practices, the case should not be dismissed at the Rule 12(b)(6) stage.[18]

In this case, the district court dismissed Bellin's due process claims after examining the New York regulations that describe—at the highest level of generality—the criteria MLTCs must consider in making initial hours determinations for personal care services. *See* N.Y. Comp. Codes R. & Regs. tit. 18, § 505.14(a). In the district court's view, the fact that MLTCs were directed to apply criteria that "require medical judgment and administrative decision making" established that MLTCs' discretion was not meaningfully channeled. *Bellin*, 457 F. Supp. 3d at 423. But whether Bellin plausibly alleged that MLTCs' discretion is meaningfully channeled cannot be answered simply by an examination of the highest-level generally applicable regulations.

The relevant regulations, which are incorporated by reference into the complaint, do not establish as a matter of law that the discretion of the MLTCs is not meaningfully channeled. The State and RiverSpring argue that because 18 N.Y.C.R.R. § 505.14(b), which sets forth criteria the MLTCs must consider, contains a physician's evaluation, a social assessment, and a nursing assessment that each require subjective judgments, the criteria are too open-ended to be meaningfully channeled. For example, the State contends that "[u]nder state law, an MLTC plan may provide personal care services only to the extent those services are 'determined to meet the patient's needs for assistance,' and 'when' those services are also 'cost effective and appropriate.'" State Br. 50 (emphasis omitted). Although the criteria involve professional and subjective

_____

[18] To be clear, we do not mean to suggest that anytime a plaintiff alleges a due process claim, the case should move on to discovery because there may be sources that could be uncovered during discovery that would help determine whether discretion is meaningfully channeled. The complaint, documents incorporated by reference into the complaint, and matters of which the court may take judicial notice must in totality raise a plausible inference that plaintiffs are entitled to relief and that the case should therefore proceed to discovery.

determinations, many of the criteria are also objective and fixed. For instance, the nursing assessment must by regulation include six specific factors, including more objective ones such as "the primary diagnosis code from the ICD-9-CM." 18 N.Y.C.R.R. § 505.14(b)(3)(iii)(b)(2). Even with the cost-effectiveness criteria, the regulation delineates the considerations and alternatives that should be taken into consideration; it does not just leave the assessment of cost-effectiveness to the MLTCs without providing any substantive guidance. *See id.* § 505.14(b)(3)(iv); *see also Fleury v. Clayton*, 847 F.2d 1229, 1232 (7th Cir. 1988) ("[T]he inclusion of elastic items in a list of criteria does not destroy a property interest.").

As a result, this case is different from *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54 (2d Cir. 1985), upon which the State relies in support of the view that "this Court and others [] reject claims of constitutionally protected entitlements" when "the regulatory scheme involves both professional judgment and open-ended criteria." State Br. 48. In *Yale Auto Parts*, the Court held that the plaintiff businesspeople had no constitutionally protected property interest in approval by the West Haven Zoning Board of Appeals of the location for an auto junkyard. 758 F.2d at 60. The Court highlighted the appellate zoning board's statutory duty to take into account highly subjective considerations such as "the health, safety and general welfare of the public," and, citing this substantial "discretion," concluded that the plaintiffs lacked the requisite property interest. *Id.* at 59.[19]

---

[19] In addition, the *Yale Auto Parts* court did not affirm dismissal of the complaint simply because the Zoning Board of Appeals applied subjective criteria. The court emphasized that the plaintiff in that case did not allege that "but for the" alleged due process violation, the Zoning Board of Appeals "would have been required to award them the requested" approval. *Id.* at 60. The presence of highly subjective criteria confirmed that there was no "certainty or a very strong likelihood that," absent the alleged denial of due process, plaintiff's "application would have been granted." *Id.* at 59. In Bellin's case, by contrast, the Commissioner's designee has already

In her complaint, Bellin plausibly alleged that "MLTCs' decisions regarding the appropriateness and amount of personal care services to provide to Medicaid recipients are not independent professional judgments because those decisions are governed by, and must conform with Federal and New York State statutes, regulations, manuals and transmission letters." Jt. App'x 20. She pointed out that they must by contract provide sufficient services "to reasonably be expected to achieve the purpose for which the services are furnished," and that they must be furnished at levels "no less . . . than [those] furnished to beneficiaries under fee-for-service Medicaid." *Id.* at 17 (quoting 42 C.F.R. § 438.210(a)). She further alleged that, when certain regulatory criteria are satisfied, "MLTC plans are required to provide medically necessary in-home personal care services up to and including 24 hours per day." *Id.* (citing 18 N.Y.C.R.R. §§ 505.14(a)(3), (5), 505.28(b)(4), (8)). As explained above, the criteria outlined in 18 N.Y.C.R.R. § 505.14(b) place substantive limitations on the MLTCs' decision-making. In addition, the complaint identifies the MLTC Policy, which incorporates the Uniform Assessment System, a special tool that all parties discuss in their briefing and as Bellin argues "generates the answers to certain questions about functional impairments." Bellin Reply Br. 22. Although Bellin's complaint was not a model of specificity, it included these plausible, relatively specific allegations that MLTCs' decision-making is

---

determined that RiverSpring's May 2019 assessment supported her entitlement to 24-hour, live-in personal care services. Absent the denial of her right to appeal, then, RiverSpring would almost certainly have been required to offer Bellin that care as part of its initial care services hours determination. We also read the *Yale Auto Parts* case to be concerned about applying federal due process review to state administrative decision-making. In light of the substantial federal role in overseeing and regulating state Medicaid programs, we see no similar risk here of "open[ing] a Pandora's Box of unnecessary federal-state conflict." *Yale Auto Parts*, 758 F.2d at 59.

not unbounded; rather, it is meaningfully channeled, and on this basis she claimed a constitutionally protected property interest in a particular level of care.

Other aspects of the record in the district court reinforce the plausibility of Bellin's due process claim. In opposing the motion to dismiss, Bellin filed with the district court the initial decision and portions of the record in her fair hearing appeal in which she sought reimbursement for the days she went without full-time care before RiverSpring determined she was entitled to care at that level. *See* Declaration of Aytan Y. Bellin, Exs. A, B, *Bellin v. Zucker*, 457 F. Supp. 3d 414 (S.D.N.Y. 2020) (No. 19-cv-5694 (AKH)), ECF No. 45.[20] She also included records of another fair hearing decision made publicly available in a redacted format, in light of the privacy interests in the medical information it necessarily contains.[21] *Id.*, Ex. D.

In deciding Bellin's fair hearing appeal (as described above), the Commissioner's designee reviewed RiverSpring's evaluations of Bellin's condition and concluded that they conclusively established her entitlement to 24-hour, live-in care. This fair hearing decision lends plausibility to Bellin's allegation that the MLTCs are required to provide a particular level of personal care services upon finding that beneficiaries satisfy certain criteria. Contrary to the district court's suggestion that the regulatory scheme merely *authorizes* a certain level of care when certain criteria are met, *Bellin*, 457 F. Supp. 3d at 423, and does not require that care be offered, the fair hearing record plausibly establishes that upon finding certain criteria satisfied, MLTCs *must* provide 24-hour

---

[20] The record did not include the amended fair hearing decision, which was issued after Bellin filed her opposition to the motion to dismiss. Because it concerned the date on which an entitlement began rather than the entitlement and record itself, it is not relevant to our discussion at this point.

[21] As discussed in note 10, *supra*, these fair hearing decisions are matters of public record properly subject to judicial notice.

personal care services, *see* Appellant's Reply Br. 25 ("The fair hearing decisions indicate unequivocally that upon satisfying the criteria for a particular number of home care hours, the hours must be awarded.").

Critically, Bellin's fair hearing decision does not appear to be unique in this aspect. She cites several other fair hearing decisions that reflect an apparent practice in the Department of Health of reviewing MLTCs' assessments and concluding based on the satisfaction of certain criteria that beneficiaries are entitled to a specific number of personal care services hours. *See* Appellant's Br. 48-49; Appellant's Reply Br. 26. For instance, in one case, the Commissioner's designee ruled that an MLTC had wrongly denied a 99-year-old recipient's request to increase her personal care services from 12 hours per day to 24-hour, live-in care. The Commissioner's designee reached this conclusion based on the MLTC's assessment, which indicated that the recipient could not walk or use a toilet without support. *See* Decision After Fair Hearing, No. 8110102H (State of N.Y. Dep't of Health Aug. 12, 2020), https://otda.ny.gov/fair%20hearing%20images/2020-8/Redacted_8110102H.pdf (last visited July 9, 2021); *see also* Decision After Fair Hearing at 21-22, No. 8171784M (State of N.Y. Dep't of Health July 13, 2020) (directing MLTC to increase appellant's personal care services hours from 10 hours per day to 24-hour, live-in care based in part on "skilled services nurse[']s notes contained in the Plan's evidence"), https://otda.ny.gov/fair%20hearing%20images/2020-8/Redacted_8171784M.pdf (last visited July 12, 2021).

The fact that administrative review is possible for such similar claims supports Bellin's claim that beneficiaries have a property interest in the initial determination of their personal care services hours. Our decision in *Furlong v. Shalala*, 156 F.3d 384 (2d Cir. 1998), is instructive in this regard. In *Furlong*, plaintiff anesthesiologists challenged the denial of the right of non-assigned physicians to appeal Medicare adverse payment

decisions. The anesthesiologists asserted that they were denied a constitutionally protected property interest when they were prevented from appealing insurance carriers' decisions to deem certain of their services "surgical," resulting in lower reimbursement rates. *Id.* at 389, 393. The Court first explained that federal regulations left insurance carriers with considerable discretion in deciding whether a service was "surgical," and so did not provide a basis for identifying a protected property interest. *Id.* at 394. But the Court then considered the fact that, when assigned physicians—who had appeal rights—appealed the designation of the same services as the non-assigned plaintiff anesthesiologists performed, ALJs repeatedly reversed the carriers' decisions. *Id.* Recognizing that these ALJ decisions were "persuasive authority in interpreting Medicare law," and ruling that the "constant, consistent pattern of ALJ decisions" was sufficient to create a property interest in the designation of services, the Court held that the plaintiff anesthesiologists had a protected property interest in receiving the higher reimbursement amount. *Id.* at 395-96. In the same way, the fair hearing appeal decisions Bellin identifies lend support to her assertion of a constitutionally protected property interest.[22]

Bellin therefore plausibly alleges a property interest in MLTCs' initial care services hours determinations. We appreciate the State's argument that the regulations introduce sufficiently "open-ended considerations" into these determinations that

_____

[22] The State and RiverSpring are largely silent about the relevance of the State fair hearing decisions to Bellin's due process claims. RiverSpring argues that "the fact . . . that fair hearing decisions include descriptions of the standards and procedures MLTCs must utilize when making home-care-hour determinations . . . (which are nothing more than recitations of the guidelines) . . . does not demonstrate that a plan is required to authorize a specific level of personal care services upon rote application of such standards and procedures." RiverSpring Br. 34. However, "rote" application is not required to establish that discretion is meaningfully channeled.

Bellin cannot have a constitutionally protected property interest in a particular level of care, even at the full-time, live-in level, where one might imagine few would differ on the level of need. State Br. 51. Yet, to survive the motions to dismiss, it was not Bellin's burden to make anything more than a plausible allegation that MLTCs' discretion is channeled so as to create a property interest in initial hours determinations, and the district court was obligated to draw all reasonable inferences from Bellin's allegations in her favor. Bellin carried this burden.

On remand, the parties will likely have the opportunity to develop the record concerning how these personal care services hours determinations are made and what the applicable regulations require of both the MLTC and the State. This includes the various forms of guidance that may be non-public and may limit MLTCs' discretion to which Bellin alluded in her complaint. *See* Jt. App'x 20 ("MLTCs' decisions regarding the appropriateness and amount of personal care services to provide to Medicaid recipients are not independent professional judgments because those decisions are governed by, and must conform with . . . *manuals* and *transmission letters*." (emphasis added)). It also includes the way MLTCs' discretion is channeled in practice. Given the review of assessment records that occurs in fair hearing appeals, the way the Uniform Assessment System works in practice may be particularly relevant on remand. RiverSpring acknowledges that "the [Uniform Assessment System] assigns a numbered [nursing facility level of care] score based on the various data collected." RiverSpring Br. 32. Although RiverSpring submits on appeal that this data includes "the subjective observations of the assessor," and that two beneficiaries may receive the same score and yet receive different levels of care, *id.*, the fair hearing appeal decisions suggest that these assessments at least sometimes support an obvious entitlement to a particular number of personal care services hours. The evaluation of this and other relevant issues will benefit from further factual development on remand.

28

### 3. *Beneficiary Choice and MLTC Competition*

The district court cited "choice on the part of the potential Medicaid enrollee, and the possibility of competition among MLTCs as to the quantity and quality of care each proposes to offer," as additional reasons for its conclusion that Bellin lacks a constitutionally protected property interest in the initial determination of her care services hours. *Bellin*, 457 F. Supp. 3d at 423. These aspects of New York's Medicaid scheme have no legitimate bearing on whether Bellin has a constitutionally protected property interest. The fact that a beneficiary can seek out another MLTC and go through the same evaluation process does not affect whether the regulatory scheme "meaningfully channel[s] official discretion by mandating a defined administrative outcome." *Kapps*, 404 F.3d at 113. If we were to hold otherwise, states could dodge the dictates of the Due Process Clause by having multiple firms "compete" to assess beneficiaries' entitlement to a particular amount of a benefit and to provide that benefit, even if in practice those "competing" assessments yielded the same outcomes and the competition was largely illusory.[23] The fact that beneficiaries can opt to seek initial

_____

[23] In other words, one cannot infer "choice" and "competition" from the presence of multiple MLTCs to which a beneficiary may apply. The number of available MLTCs varies by region, and federal law requires states to ensure only that two managed care organizations are available to any given enrollee, subject to certain exceptions. *See* 42 U.S.C. § 1396u-2(a)(3). Meanwhile, the same structure that is designed to generate cost savings in the managed care model may also create incentives for providers *not* to offer adequate care to high-needs beneficiaries in hopes that those beneficiaries choose the competition. Recall that MLTCs are paid a flat capitation per beneficiary. When considering a high-needs beneficiary such as Bellin, MLTCs may have an incentive *not* to take her on as a patient—and therefore an incentive *not* to offer an attractive or even adequate number of personal care hours. *See* 2003 Interim Report at 20-21 (explaining that MLTCs are "paid a predetermined amount per member per month" and that, although regional rates vary based on broad enrollee demographic and other factors, MLTCs ultimately bear the risks associated with covering the costs of "all needed medical services" for any single enrollee through these payments). The Medicaid and CHIP Payment and Access Commission, a non-partisan federal legislative agency, has observed that

offers of personal care service levels from multiple MLTCs, and that these MLTCs may provide different initial determinations, does not preclude finding that Bellin plausibly alleged beneficiaries have a constitutionally protected property interest in the initial determination of the care hours they will receive.

### B. Constitutionally Adequate Protections

The State argues that, even if Bellin has a constitutionally protected interest in the amount of personal care services she receives, New York's procedures for reviewing MLTCs' initial offers of such hours "are constitutionally adequate." State Br. 55; *see Furlong*, 156 F.3d at 395 ("The issue of what constitutes a substantive property interest is analytically distinct from the issue of what procedures must be followed if such interest is to be taken away."). In keeping with our general practice, however, we decline to reach this question as it was not addressed by the district court. *See Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 418-19 (2d Cir. 2001) (explaining that, although it has "broad discretion" to address such questions, the Court generally does not reach questions not addressed by district court).

The State contends that it raised the constitutional adequacy of process argument in his motion to dismiss to preserve it for our consideration on appeal. We leave it to the district court to decide whether on remand, before discovery proceeds, the State (or RiverSpring) may challenge the adequacy of Bellin's allegations regarding the inadequacy of current procedural protections.

---

"[c]apitated plans may also seek to enroll as many healthy patients as possible and discourage participation of disabled or high utilizing enrollees." MEDICAID & CHIP PAYMENT & ACCESS COMM'N, *Managed care's effect on outcomes*, https://www.macpac.gov/subtopic/managed-cares-effect-on-outcomes/ (last visited July 10, 2021). We do not mean to suggest that this is how RiverSpring or any other MLTC in New York operates in practice—only that one cannot safely infer beneficiary "choice" and "competition" as would be relevant here from the fact that beneficiaries may seek service offers from multiple MLTCs.

**III.     Statutory Claims**

Bellin also appeals the district court's dismissal of her § 1983 claims alleging the State's violation of her federal statutory rights. In interpreting any statute, we start with—and absent any ambiguity, end with—the plain meaning of the text construed in its statutory context. *See, e.g.*, *MacNeil v. Berryhill*, 869 F.3d 109, 113 (2d Cir. 2017).

A.     <u>Enrollee Appeal Rights</u>

Bellin first argues that she is entitled to appeal initial care hours determinations under the federal statutes and regulations governing the appeal rights of Medicaid beneficiaries. 42 U.S.C. §§ 1396a(a)(3), 1396u-2(b)(4); 42 C.F.R. Part 438. Specifically, Bellin avers that after she "enrolled with RiverSpring, RiverSpring was required to process [her] appeal of RiverSpring's initial authorization" and to provide her notice of her right to appeal the initial determination. Appellant's Br. 24. Bellin does not contest that she was not formally "enrolled" in RiverSpring until June 1, 2019, when her care began.

Section 1396u-2 requires managed care organizations such as MLTCs to "establish an internal grievance procedure under which an enrollee who is eligible for medical assistance under the State plan under this subchapter, or a provider on behalf of such an enrollee, may challenge the denial of coverage of or payment for such assistance." 42 U.S.C. § 1396u-2(b)(4). As explained in corresponding CMS regulations, MLTCs must provide an internal appeal right, and notice of that right, whenever the MLTC makes an "adverse benefit determination." 42 C.F.R. § 438.404(b) (requiring that managed care organizations provide notice explaining the "adverse benefit determination," the "enrollee's right to request an appeal of the . . . adverse benefit determination," and the "procedures for exercising" that right); *see also id.* § 438.402(c)(2)(ii) ("Following receipt of a notification of an adverse benefit determination . . . , an enrollee has 60 calendar days from the date on the adverse

benefit determination notice in which to file a request for an appeal to the managed care plan.").

Applicable regulations define an "adverse benefit determination" as, among other things, "[t]he denial or limited authorization of a requested service, including determinations based on the type or level of service, requirements for medical necessity, appropriateness, setting, or effectiveness of a covered benefit." 42 C.F.R. § 438.400(b)(1). Bellin argues that RiverSpring's initial determination that Bellin was eligible for only eight hours of personal care services per day constituted an "adverse benefit determination" within this statutory scheme. Appellant's Br. 24. Once Bellin enrolled with RiverSpring, she maintains, RiverSpring was obliged to provide her notice of her right to appeal.

We are not persuaded that the "adverse benefit determination" contemplated by these regulations includes an MLTC's initial determination of personal care hours. An adverse benefit determination is the "denial or limited authorization of a *requested* service," 42 C.F.R. § 438.400(b)(1) (emphasis added), but Bellin had no opportunity to formally "request" 24-hour, live-in personal care services when she sought an evaluation by RiverSpring. Bellin conceded before the district court that Medicaid beneficiaries do not "request" a particular number of care hours in applying for those services: she described instead an informal procedure for making "requests," in which beneficiaries may tell an MLTC's assessing nurse the number of care hours they hope to receive, and thereby de facto make a request for a service that may be denied or limitedly authorized. *See* Letter Addressed to Judge Alvin K. Hellerstein at 2, *Bellin v. Zucker*, 457 F. Supp. 3d 414 (S.D.N.Y. 2020) (No. 19-cv-5694 (AKH)), ECF No. 58 (explaining that the Medicaid application form "does not contain a place to request a particular number of hours of care," but that a personal care services applicant "generally makes a request for a particular number of hours of home care services later,

32

to an MLTC nurse, who comes to the applicant's home to determine the number of hours of home care to which the applicant is entitled"). Although Bellin argues that she "requested" 24-hour service after RiverSpring's initial evaluation and before she enrolled and "requested" an appeal of RiverSpring's determination after she enrolled, *see* Appellant's Br. 22, 24, she does not claim that this sort of de facto informal request to an MLTC nurse is contemplated by the Medicaid laws.

In Bellin's case, after a RiverSpring nurse informed Bellin that she was going to recommend that Bellin receive eight hours of personal care services daily, Bellin alleges that she "protested" that amount of care "through her daughter," claiming it "was woefully insufficient." Jt. App'x 21. We do not see how this statement, or even a request made before the evaluation began, could constitute an actionable "request" for care hours that RiverSpring "denied" in its initial determination under the plain meaning of the term "request" as understood in its statutory context. In this circumstance, the statute unambiguously establishes that MLTCs' initial personal care hours determinations cannot constitute adverse benefit determinations.

This conclusion is further supported by the regulations governing notice of adverse benefit determinations. CMS regulations require that notice of decisions denying services be mailed within 14 days of the request for services. *See* 42 C.F.R. § 438.404(c)(3) (requiring that notice of "standard service authorization decisions that deny or limit services" be mailed to enrollees "within the timeframe specified in § 438.210(d)(1)."); *id.* § 438.210(d)(1) ("For standard authorization decisions, [the MLTC must] provide notice as expeditiously as the enrollee's condition requires and within State-established timeframes that may not exceed 14 calendar days following receipt of the request for service . . . ."). Bellin maintains that pre-enrollment initial determinations of personal care services hours trigger this notice requirement based on informal requests made by potential recipients for a particular number of hours. Yet Bellin

33

concedes that only *enrollees* are entitled to notice under this provision. Since potential recipients have more than 14 days to accept pre-enrollment offers from MLTCs, and enrollment may not follow until weeks after that, 14 days could regularly elapse between the request for a specific number of personal care services hours and the time when a recipient enrolls in an MLTC. As a result, MLTCs could often involuntarily violate the notice provision even if they gave notice of appeal rights the day a recipient began to receive care and thus became an enrollee.

Bellin responds that MLTCs could avoid this problem by "providing [each] potential enrollee with the required appeal notice when the [MLTC] makes its initial service determination." Appellant's Br. 27. This misunderstands the problem. While it might be feasible for MLTCs to provide the required notice to every potential enrollee at the time of the initial assessment, the regulations contemplate notice to *enrollees* only, and the impossibility of providing notice on the regulatory timetable, as discussed, provides another reason to doubt that Bellin's reading of these provisions comports with their intended meaning.[24]

---

[24] As the State notes, CMS knows how to require notice to potential enrollees and how to identify potential enrollees when a notice must go to them. *See, e.g.*, 42 C.F.R. § 438.10 (requiring managed care organizations to "provide all required information in this section to enrollees and potential enrollees in a manner and format that may be easily understood and is readily accessible by such enrollees and potential enrollees"). Bellin counters that, in her view, CMS generally uses "enrollee" to include "potential enrollees" as well. Bellin's argument relies, however, on misreadings of CMS responses to public comments published in the Federal Register. Bellin cites a CMS discussion of "potential enrollee financial liability" as if it is discussing the financial liability of potential enrollees. *See* Medicaid and Children's Health Insurance Program (CHIP) Programs; Medicaid Managed Care, CHIP Delivered in Managed Care, and Revisions Related to Third Party Liability, 81 Fed. Reg. 27,498, 27,507 (May 6, 2016). In fact, in the quoted passage CMS appears to be discussing the *potential financial liability of enrollees*, since its response is to comments recommending "that CMS revise the definition of 'adverse benefit determination' to include disputes regarding an enrollee's financial liability."

B.      Fair Hearing Appeal Rights

Bellin argues in the alternative that Medicaid beneficiaries are entitled to an appeal of initial care hours determinations based on the guarantee of fair hearing appeal rights in 42 U.S.C. § 1396a(a)(3) and accompanying CMS regulations. State Medicaid plans must "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3). This requirement is further outlined by CMS regulation:

> The State agency must grant an opportunity for a hearing to . . . [a]ny individual who requests it because he or she believes the agency has taken an action erroneously, denied his or her claim for eligibility or for covered benefits or services, or issued a determination of an individual's liability, or has not acted upon the claim with reasonable promptness . . . .

42 C.F.R. § 431.220(a)(1). Bellin argues that RiverSpring "denied . . . her claim for . . . covered . . . services" and she was entitled to appeal that denial at a fair hearing. *Id.*

But Bellin did not make a "claim" for personal care services that was "denied." *Id.* As explained in Part III.A above, Bellin did not and could not request a certain number of hours when she sought evaluation by RiverSpring. Bellin points to statements by CMS that the denial of a claim includes the "denial of a particular 'level of benefits,'" Appellant's Br. 20, but this does not alter the analysis. No party disputes that, once enrolled, recipients may request additional personal care services hours and may appeal the denial of their request. What Bellin fails to provide support for is the proposition that potential recipients at any point make a "claim" for a particular

---

*Id.* at 27,507. This same misreading underlies the use of "potential enrollee" on the next page of the Federal Register, which Bellin also cites in support of her argument. *See id.* at 27,508.

35

number of hours of personal care services that is denied through MLTCs' initial hours determinations.

In the absence of clear textual support for her view, Bellin argues that interpreting federal law not to require a fair hearing right in the instant circumstance would "amount to an improper repeal of the long-standing appeal rights granted by 42 U.S.C.[]§ 1396a(a)(3)." Appellant's Br. 34. In making this argument, Bellin relies on the well-established presumption that Congress does not repeal earlier statutes *sub silentio*. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 662 (2007) ("We will not infer a statutory repeal unless the later statute expressly contradicts the original act or unless such a construction is absolutely necessary in order that the words of the later statute shall have any meaning at all."). According to Bellin, an interpretation of § 1396u-2 that denies beneficiaries fair hearing rights effects a repeal of § 1396a and should be avoided.

In the fee-for-service model, local social services districts determine beneficiaries' entitlement to personal care services and the number of hours they receive. These determinations are subject to appeal in a fair hearing. Congress passed § 1396u-2 in 1997 and substantially expanded states' ability to use a managed care model to deliver Medicaid services. *See* Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251. New York now requires beneficiaries like Bellin to receive personal care services from MLTCs. These managed care organizations both assess beneficiaries' care hours needs and provide them with that care.

Bellin would have us read into § 1396u-2 a congressional guarantee that beneficiaries' fair hearing rights remain untouched in the move to managed care. We see no basis in the statute to understand that Congress intended such a guarantee. For example, § 1396u-2 requires managed care organizations to set up internal appeal procedures. *See* 42 U.S.C. § 1396u-2(b)(4) (requiring managed care organizations to

"establish an internal grievance procedure under which an enrollee . . . may challenge the denial of coverage of or payment for such assistance"). Although not addressed in the statute, subsequently issued CMS regulations require that beneficiaries' appeals be handled by managed care organizations in the first instance; only after that can beneficiaries demand an appeal through a fair hearing. *See* 42 C.F.R. § 438.408(f)(1) ("An enrollee may request a State fair hearing only after receiving notice that the [managed care organization] . . . is upholding the adverse benefit determination."); *see also id.* § 438.402(b) ("Each [managed care organization] . . . may have only one level of appeal for enrollees."). The result is a substantial limitation of beneficiaries' rights to appeal through a fair hearing.

Bellin cites statements by CMS during a notice and comment period regarding 42 C.F.R. Part 438 to argue that "CMS has explicitly disavowed any intent to limit individual[s'] pre-existing appeal rights under 42 U.S.C. § 1396a(a)(3)." Appellant's Br. 36. Upon closer inspection, however, CMS did no more than largely reiterate the importance of beneficiaries generally retaining fair hearing rights. For instance, Bellin cites a CMS statement that it was "critical that all beneficiaries . . . have access to the State fair hearing process rights provided for" in § 1396a(a)(3). Medicaid Program; Medicaid Managed Care, 66 Fed. Reg. 6228, 6341 (Jan. 19, 2001). But no party disputes that beneficiaries remained entitled to robust fair hearing rights under the managed care model. The question is whether those fair hearing rights had to mirror prior fee-for-service hearing rights in every respect. In promulgating the internal grievance procedure rules, CMS explained that it was acting pursuant to its authority under § 1396a(a)(3) as well as § 1396u-2, and that before its rulemaking, § 1396a(a)(3)'s fair hearing requirements "ha[d] not been implemented in regulations that appl[ied] to managed care enrollees." *Id.* at 6335. CMS thus recognized that a managed care model required the development of *new* fair hearing procedures tailored to that model.

Accepting Bellin's argument would demand that we import wholesale the fair hearing requirements applicable to the fee-for-service model into this substantially different context. Finding Bellin's reading of the statutory language strained, we decline to do so.

Bellin is not wrong that New York's managed care system has altered beneficiaries' appeal rights. If every MLTC that evaluates a beneficiary makes too low an initial personal care services hours determination, that beneficiary is left with no choice but to accept one of the offers of care, begin care receiving fewer hours than she is entitled to receive, and then go through the process of requesting more hours, waiting for a decision, appealing internally, and appealing to a fair hearing. Meanwhile, the State does not dispute that the same beneficiary in a fee-for-service care delivery model would be entitled to appeal immediately the number of personal care hours initially determined. The limits on beneficiaries' appeal rights may prove important on remand in evaluating Bellin's procedural due process claims. They do not provide a persuasive basis for concluding that beneficiaries have a federal statutory right to appeal an MLTC's initial care hours determination.

**CONCLUSION**

New York's decision to restructure the initial determination of Medicaid beneficiaries' personal care services hours had major consequences for those seeking to challenge and promptly resolve the number of hours of care they would receive. Although we conclude that the resulting limitations on beneficiaries' appeal rights do not violate federal Medicaid law, we hold that Bellin has plausibly alleged that those limitations deprive her and similarly situated plaintiffs of a constitutionally protected property interest.

For the reasons set forth above, the judgment of the district court is **AFFIRMED** in part and **VACATED** in part, and the action is **REMANDED** for further proceedings consistent with this Opinion.